422 N.W.2d 560 (1988)
228 Neb. 368
Judy DIETER, Appellant,
v.
STATE of Nebraska, DEPARTMENT OF SOCIAL SERVICES, et al., Appellees.
No. 87-130.
Supreme Court of Nebraska.
April 29, 1988.
*561 *562 R.D. Stafford of Brogan & Stafford, P.C., Norfolk, for appellant.
Robert M. Spire, Atty. Gen., and Royce N. Harper, Lincoln, for appellees.
HASTINGS, C.J., and BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.
GRANT, Justice.
This is an appeal from the district court for Madison County, affirming an order of the director of the Department of Social Services (DSS). The order revoked the day-care center licenses of the appellant, Judy Dieter. On appeal, appellant contends that the district court erred in finding that the director reached her order revoking appellant's licenses upon "lawful procedure," in finding that the director's order and the procedure used to reach the order did not violate both the state and federal Constitutions, and in rendering a judgment not sustained by competent, material, or substantial evidence. We affirm.
The record shows the following. Appellant was licensed to operate two day-care facilities in Norfolk, Nebraska, the Playhouse Day Care Center (hereinafter Playhouse I), licensed in 1980, and the Playhouse Too Preschool and Day Care Center (hereinafter Playhouse II), licensed in 1983. DSS had periodically renewed appellant's licenses. Playhouse I is licensed to provide care for 45 children, and Playhouse II is licensed to provide care for 77 children.
Early in February 1985, DSS received complaints about the disciplinary practices at Playhouse II facilities and derogatory remarks made to the children by appellant. On February 28, a licensing specialist for DSS investigated the facilities in order to determine whether appellant was in compliance with the licensing regulations. During the investigation, appellant admitted that she "may have swatted" the children. Appellant then signed a written statement saying that she would not "swat" children from that day on. After appellant signed the statement, the investigator determined that appellant generally was in compliance with the department's day-care regulations. The investigator determined that the allegation involving derogatory remarks made to the children was unsubstantiated.
On January 24, 1986, Officer Robert Lankford of the Norfolk Police Department commenced an investigation after the police department had received complaints of possible mistreatment of children at the day-care facilities. On February 24, 1986, Officer Lankford interviewed appellant at Playhouse I. At that time, appellant informed Lankford that she spanked children when she had parental permission. Lankford then asked appellant whether she had ever force-fed a child. At the hearing, Lankford testified as to her response:
Mr. Lankford: Her response verbally was, "do you mean like this".

*563 [Appellees' attorney]: And what did she do?
Mr. Lankford: At the time she made that statement she placed a hand to her face, thumb on one side and fingers on the other and appeared to open her jaw by squeezing them together, the two cheeks. At that point I stated yes, like that, and she replied no, never.
DSS was informed of the investigation in January 1986 and received a written report of the investigation in mid-February. No criminal charges were filed by the police as the result of the investigation. After the initial report was sent, however, Officer Lankford continued his investigation and apprised DSS of "[p]eriodic updatings." DSS received a second written report from Lankford sometime after March 5, 1986. This report consisted of various interviews conducted subsequent to the original report.
In a letter dated March 4, 1986, and hand-delivered to appellant on March 6, the licensing supervisor for DSS informed appellant that her licenses to operate her day-care facilities had been revoked. Attached to the letter was a copy of the "Emergency Declaration and Order" signed by the director. The letter informed appellant that she was entitled to an appeal of the director's decision. The declaration and order stated that the department was acting pursuant to Neb.Rev.Stat. § 71-1915(3) (Reissue 1986), and informed appellant that
a recent investigation has determined that there is substantial evidence that excessive physical punishment, as a means of discipline, is being used in one or both of the Day Care Centers in violation of licensing standards of the Department of Social Services that appears [sic] at 474 Nebraska Administrative Code, Part 6-002.08G3. There also appears to be substantial evidence of behavior which may be injurious to or which may endanger the health or morals of the children in care, as stated in Part 6-002.08D of the Nebraska Administrative Code.
Section 71-1915(3) sets out the procedure to be followed by the director in the event of an emergency, and provides as follows:
Whenever the director finds that an emergency exists requiring immediate action to protect the physical well-being and safety of a child in an early childhood program, the director may, without notice or hearing, issue an order declaring the existence of such an emergency and requiring that such action be taken as the director deems necessary to meet the emergency. Notwithstanding the provisions of subsection (1) of this section, such order shall be effective immediately. Any person to whom the order is directed shall comply immediately, except that upon application to the director, the person shall be afforded a hearing as soon as possible and not later than ten days after his or her application for the hearing. On the basis of such hearing the director shall continue to enforce his or her order or revoke or modify it.
On March 17, DSS sent a supplemental notice to appellant. The letter informed appellant that the investigation conducted by Officer Lankford revealed that appellant had been observed spanking, slapping, handling the children roughly, biting, feeding the children by force, pulling the hair of the children left in her care, and using profane language. The letter stated that appellant's conduct was in violation of three specific regulations which had been issued by DSS pursuant to Neb.Rev.Stat. §§ 71-1908 through 71-1918 (Reissue 1986) and which are codified at Neb.Admin.Code tit. 474, ch. 6, § 002 (1986).
On March 12, 1986, appellant requested a hearing on the director's order. The hearing was scheduled and begun by DSS on Monday, March 24, a date which satisfied the 10-day requirement of § 71-1915(3). The hearing continued on March 26 and 28, and April 10, 1986.
At the hearing, several of appellant's former employees testified as to appellant's conduct toward the children in appellant's facilities.
*564 Doris Kuehler, who was employed as a cook at Playhouse II from September until December 1984, testified that appellant force-fed the children whenever they did not finish eating their meals. Kuehler testified that, in September or October 1984, she observed appellant poke food into E.B.'s mouth with a spoon, hold his mouth shut while he was crying, and warn him to swallow or he would be spanked. Kuehler further testified that she had observed appellant force-feed K.P. until the child vomited into her plate. Kuehler then observed appellant "poke the vomit of spoon [sic] toward [the child's] mouth and generally speaking give up and one of us would take the child and go clean her up." Kuehler testified that she observed appellant forcing S.R. to consume a beverage by holding the child's head back and pouring it down her throat. Kuehler further testified that she had observed appellant spank three of the children at the center.
Kathleen Schwartzer, who was employed at Playhouse II from August 1985 until January 1986 to assist appellant in setting up a preschool program, testified that shortly after she had begun working for appellant, she had observed appellant forcing another child, D.P., to eat french fries after he refused to eat. Schwartzer testified that the child had thrown up, and appellant had told the child he was
going to eat them anyway. So then she took [D.P.] into the bathroom and you could hear her spanking him and [he] was yelling and crying. He came back out and she sat him down again. [The child] threw up again and when Judy left I proceeded to take him in and clean him up and [D.P.] said, will you please call mom.
Schwartzer testified that on December 9 and 11, 1985, while the children were rehearsing for a Christmas program, she had observed appellant spank two different children, E.B. and D.K. Sally Hanway, who was employed as a preschool teacher at Playhouse II from August 1982 through March 6, 1986, testified that she had observed appellant pull another child, C.B., off the stage and spank him during the rehearsals. Schwartzer further testified that in January 1986, she had observed appellant pulling the hair of J.M. after that child had refused to drink her milk. On another occasion, she had observed appellant slap R.G. after R.G. spit some food out of her mouth.
Elizabeth Piepho, who had been employed as a preschool teacher at Playhouse II from October 1984 to August 1985, testified that she had observed appellant "shove" apples into S.R.'s mouth after S.R. refused to eat them, sometime after Christmas in 1984. Piepho described the incident as follows:
[Piepho]: Judy [appellant] would take ahold of [S.R.'s] chin and press it down, take two or three or four pieces of apple and shove them in her mouth which was already full.
[Appellees' attorney]: And then what happened?
[Piepho]: Well, she would start crying, [S.R.] would start crying and then she'd try to chew it up and swallow it but couldn't and then she'd throw it up. She would throw up what she had had earlier.
Piepho further testified that she had observed another child, C.B., being forced to sit in the dark for not eating his food and that appellant had told her that Piepho could spank the children "if they deserved it."
Marcia Pieper, who was employed at Playhouse II from November 1985 until January 1986, testified that she had observed appellant, sometime in January 1986, force-feed a child as follows: "[D.K.] wasn't eating and Judy had sat down and opened his mouth with her hands and put the beans, some beans in his mouth and he spit them out and she slapped him on the face a couple of times."
Jackie Sunderman testified that in November 1985, while she was employed at Playhouse II, she had informed appellant that one of the children, C.B., had bitten another child. Appellant then asked Sunderman if she "bit [C.B.] back." When Sunderman responded that she had not, appellant bit C.B. on his arm. Danita *565 Drenkow, another employee who had observed this same incident, testified that appellant had stated that she had bitten C.B. in order to "show him what it felt like to bite somebody."
The parent of a child who had been enrolled at Playhouse II from May 1984 through January 1986 testified that in January 1986, her daughter informed her that appellant had spanked the daughter and pulled her hair. The parent then confronted appellant at the day-care center, and testified that appellant informed the parent that her daughter "got her spanking because she wouldn't be quiet at nap time."
After the administrative hearing, reflected in 463 pages of testimony, the director of DSS entered an order continuing her earlier order revoking appellant's license. On appeal, in an order dated January 20, 1987, the district court for Madison County affirmed the director's decision.
In her first assignment of error, appellant contends that DSS and its director did not reach the April 29, 1986, order upon "lawful procedure."
This court's review of an action taken by an administrative agency is de novo on the record, and this court makes independent findings of fact without reference to those made by the agency whose action is being reviewed. Neb.Rev.Stat. § 84-918 (Reissue 1987); Department of Health v. Grand Island Health Care, 223 Neb. 587, 391 N.W.2d 582 (1986); Haeffner v. State, 220 Neb. 560, 371 N.W.2d 658 (1985).
While the Supreme Court's review of an administrative decision is de novo on the record, where the evidence is in conflict, the Supreme Court will consider and may give weight to the fact that the agency hearing examiner observed the witnesses and accepted one version of the facts rather than another. As stated in Department of Health v. Lutheran Hosp. & Homes Soc., 227 Neb. 116, 117, 416 N.W.2d 222, 223 (1987), a de novo review "does not mean that we ignore the findings of fact made by the board and the fact that it saw and heard the witnesses who appeared before the board at its hearing."
Appellant, in her brief, contends that the director could not have determined that an emergency existed and was attempting to deny appellant "the rights and procedures" granted by subsection (1) of § 71-1915. Brief for Appellant at 13. Subsection (1) sets out the procedures to be used where a nonemergency violation of the regulations exists, and provides for notice and hearing before revocation of a license in that situation.
Appellant argues that the director was required to act in January 1986, as there were no "alleged violations" of those rules after that time. Id. We note, however, that although DSS was informed of the investigation in January, DSS did not receive a written report of the investigation until mid-February. At that time, the licensing supervisor for DSS, after reviewing the report prepared by Officer Lankford, recommended to counsel for DSS that an emergency order be issued. This order was eventually signed by the director. The police report itself was based on statements from witnesses substantiating the allegations of violations of the licensing standards found in the department's March 17 supplemental notice. The evidence contained in the report, as referred to in the notice to appellant, was a sufficient basis to support the director's emergency order under § 71-1915(3).
Appellant further contends in her brief that when an emergency declaration is issued pursuant to subsection (3) of § 71-1915, the director is additionally required to comply with the notice requirements of subsection (1) before revoking appellant's license. Subsection (3) clearly states that, in the event of an emergency situation, the director is entitled to issue an order without notice or hearing, prior to revocation, and that "[n]otwithstanding the provisions of subsection (1) of this section, such order shall be effective immediately." Where the language of a statute is plain and unambiguous, no interpretation is necessary to ascertain the meaning of language in a statute, and in the absence of anything indicating to the contrary, words will be given their ordinary meaning. *566 State v. Carlson, 223 Neb. 874, 394 N.W.2d 669 (1986); Kellogg Company v. Herrington, 216 Neb. 138, 343 N.W.2d 326 (1984). Subsection (3) does provide for a hearing after the emergency order has been issued.
We note that in proceedings before an administrative agency or tribunal, procedural due process requires notice reasonably calculated to inform one of the accusation levied; identification of the accuser; a factual basis for the accusation; reasonable time and opportunity to present evidence concerning the accusation; and a hearing before an impartial board. Bockbrader v. Department of Insts., 220 Neb. 17, 367 N.W.2d 721 (1985); States v. Anderson, 219 Neb. 545, 364 N.W.2d 38 (1985). In order to satisfy the requirements for due process, the notice in proceedings before an administrative agency must reasonably provide information regarding the accusation. In re Appeal of Bonnett, 216 Neb. 587, 344 N.W.2d 657 (1984). Appellant contends that the letter of March 4, 1986, and the supplemental letter dated March 17 do not "come close to apprising [appellant] of the alleged violations. There are no averments as to time, place, person, and other circumstances...." Brief for Appellant at 14. We note, however, that the letter dated March 4 and the supplemental letter dated March 17 referred to specific violations of standards. Appellant was reasonably provided with notice of the violations charged.
Appellant next contends that she was denied the right to a full and fair hearing. The record shows that on March 12, 1986, appellant requested a hearing, which had to be afforded within 10 days after request as required by § 71-1915(3). The hearing was set for March 24, 1986. On Friday, March 21, prior to the hearing, appellant made a motion for a continuance of the matter. This motion was denied due to the scheduling of DSS' witnesses. The hearing examiner, however, stated that he would grant appellant additional time to prepare her case after the conclusion of the State's case. At the close of the testimony on the first day of the hearing, on Monday, March 24, the hearing examiner continued the hearing to March 26 due to other business. Appellant then objected to that continuance. Appellant's objection was overruled, and the hearing continued, as set out above, on March 26 and 28 and April 10.
Appellant did not request a continuance after DSS concluded its case. At the close of the hearing, on April 10, 1986, the examiner gave appellant 7 days to submit written final argument. The final decision was rendered by the director on April 29, 1986. Appellant contends that the timeframe of the hearing did not provide her with a fair hearing. Although the appellant originally complained that she did not have enough time to prepare her case, she did not ask for a continuance, even though at the start of the hearing the hearing examiner informed appellant that he would continue the hearing for the preparation of appellant's case. Appellant was provided a fair hearing.
Appellant next contends that she was denied a fair hearing because the director, in her final order of April 29, 1986, was the same person who had made the initial determination to revoke appellant's license on March 4, 1986. The combination of investigative and adjudicative functions does not necessarily create an unconstitutional risk of bias in administrative adjudication. Nevels v. Hanlon, 656 F.2d 372 (8th Cir.1981); Buhrmann v. Sellentin, 218 Neb. 288, 352 N.W.2d 907 (1984). In Buhrmann, appellant contended that his due process rights were violated because the officer before whom the hearing was held had made a prior determination of appellant's guilt. We held in that case that there was no denial of due process because the officer's recommendation to terminate the appellant's employment was reviewed and approved by the Department of Correctional Services.
In Nevels, supra, appellant contended that because the commissioner made an initial determination to dismiss an employee and then made the final decision, the commissioner was predisposed to uphold the original decision. The eighth circuit adopted the rule set out in Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 *567 L.Ed.2d 712 (1975), that the "`risk of bias in administrative adjudication ... must overcome a presumption of honesty and integrity in those serving as adjudicators....'" Nevels, supra at 376. In Nevels, the eighth circuit determined that there was no risk of unconstitutional bias in the commissioner's actions.
The record shows that the director made her decision to revoke appellant's licenses at the initial recommendation of the licensing supervisor, and there is nothing in the record to show that the director was not capable of rendering an objective judgment. The director fully complied with the statutory notice and hearing requirements as contemplated by § 71-1915. Appellant's first assignment of error is without merit.
In her second assignment of error, appellant contends that the district court erred in finding that the April 29, 1986, order and the procedures used to reach that order did not violate the state and federal Constitutions. As discussed above, appellant was provided with adequate notice as provided by the statute. The notice required by the statute and afforded to appellant was adequate to comply with all constitutional requirements.
Appellant also contends that the action of the director in revoking appellant's license before she was afforded a hearing unconstitutionally deprived appellant of due process. A hearing before the revocation of a license is not always required, however. As stated in Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), was cited in Morrissey, holding that "`[c]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.'" 408 U.S. at 481, 92 S.Ct. at 2600.
Those concepts were expanded in Mathews v. Eldridge, 424 U.S. 319, 323, 96 S.Ct. 893, 897, 47 L.Ed.2d 18 (1976), where the Court stated, "The issue in this case is whether the Due Process Clause of the Fifth Amendment requires that prior to the termination of Social Security disability benefit payments the recipient be afforded an opportunity for an evidentiary hearing." Mathews v. Eldridge further set out that identification of the specific details of due process generally requires consideration of three factors:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
424 U.S. at 335, 96 S.Ct. at 903.
In the case before us, consideration of the three factors in the light of the private and governmental interests at stake leads to the conclusion that due process, in this case, does not require an evidentiary hearing before the revocation of appellant's day-care facility licenses. The results of investigations submitted to the director disclosed conduct which could well result in harm to children. Balanced against that possible harm was appellant's right to conduct her business. The interest of DSS in ensuring the safety and well-being of the children at the day-care facilities outweighs appellant's interest in the pecuniary return from her day-care operations. Under the facts of this case, no prerevocation hearing was constitutionally required before the revocation of appellant's licenses. Appellant's second assignment of error is without merit.
In her third assignment of error, the appellant claims that the judgment is not sustained by competent, material, or substantial evidence and that the evidence failed to substantiate the revocation of appellant's licenses.
*568 The record reveals that the appellant had knowledge of the regulations. Appellant was made aware of these regulations when she received her initial licenses and when she was reviewed for regulation compliance. The evidence before the hearing examiner, the district court, and this court is clearly sufficient to support the finding of the director. Portions of that evidence are set out above and will not be repeated here. Appellant did not testify, but she attacked the credibility of various witnesses in cross-examination and introduced evidence which contradicted the evidence presented by the director. Nonetheless, the evidence presented by the State, if believed, is sufficient to support the director's order.
The testimony of the witnesses establishes that appellant engaged in conduct which violated DSS' regulations and which might be harmful to the children. In our de novo review, we find that appellant engaged in such improper conduct and that such evidence is sufficient to support the revocation of appellant's licenses. We affirm the judgment of the district court.
AFFIRMED.