DEPARTMENT OF HEALTH, STATE OF NEBRASKA, APPELLANT, V. GRAND ISLAND HEALTH CARE, INC., ALSO KNOWN AS VETTER HEALTH SERVICES, INC., APPELLEE.

391 N.W.2d 582

Filed August 1, 1986.   No. 85-552.

Robert M. Spire, Attorney General, and Marilyn B. Hutchinson, for appellant.

Robert L. Lepp of McGill, Koley, Parsonage & Lanphier, P.C., for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

HASTINGS, J.

The appellee, Grand Island Health Care, Inc., filed an application for a certificate of need to construct a 60-bed, long-term-care facility for the elderly. The Nebraska Department of Health recommended denial of the application. Two public meetings were held before the Certificate of Need Review Committee, after which the committee approved the application. The Department of Health appealed to the Certificate of Need Appeal Panel. A full evidentiary hearing took place, and the panel rendered findings of facts, conclusions, an order, and a decision. Approval of the application was affirmed. The district court for Lancaster County also affirmed, and this appeal followed.

The Supreme Court's review of an administrative agency's decision is de novo on the record. Neb. Rev. Stat. § 84-918 (Reissue 1981). As such, we make independent findings of fact without reference to those made by the agency whose action is being reviewed. *Haeffner v. State*, 220 Neb. 560, 371 N.W.2d 658 (1985). From such de novo review we conclude that the action of the Certificate of Need Appeal Panel in upholding the grant of a certificate of need by the Certificate of Need Review Committee was correct. Accordingly, we affirm the judgment of the district court in its finding that the decision of the Certificate of Need Appeal Panel was supported by competent, material, and substantial evidence, and was neither arbitrary nor capricious.

The project proposed by appellee, Grand Island Health Care, is a 60-bed, long-term-care facility to be built in Grand Island, Nebraska. The appellee is a for profit corporation owned by Jack D. Vetter, who has extensive experience in the nursing home industry in the Midwest. The application sought certification for both skilled nursing and intermediate-care beds, proposing to provide care for medicare, medicaid, and private pay residents. Proposed services included nursing care and specialized services in rehabilitation, i.e., physical therapy, occupational therapy, speech therapy, and recreational therapy. Hospice care for the terminally ill and their families was proposed in conjunction with area hospital hospice programs. The proposed facility was designed with 25 semiprivate rooms

and 10 private rooms on a single level, with specific areas for rehabilitation, recreation, personal care, and spiritual fulfillment.

The consideration of an application for a certificate of need is governed by three authorities: (1) The Nebraska Health Care Certificate of Need Act, Neb. Rev. Stat. §§ 71-5852 through 71-5855 (Cum. Supp. 1984); (2) Department of Health regulations promulgated under the certificate of need act, Neb. Admin. Code tit. 182, ch. 2, §§ 005 through 006 (1983); and (3) The Nebraska State Health Plan 1982-1987 (Neb. Dept. of Health 1982) on file with the Nebraska Secretary of State. The construction of these statutes, regulations, and state health plan must be performed with particular attention to the policy behind these authorities, their purposes, and the context within which they were drafted and promulgated.

Nursing home costs have been on the rise in recent years, with nursing home care in Nebraska increasing from $5.78 per capita in 1966 to $66.38 per capita in 1978. These figures represent an annual increase of 21.6 percent and a total increase of 1,048 percent over the 12 years studied. During the same period, national nursing home expenditures increased from $7.18 to $70.64, an annual increase of 20.1 percent and an overall increase of 884 percent. Between 1966 and 1978, all health service expenditures paid for nursing home care increased from 3.9 percent to 9.4 percent.

Due to public funding cutbacks, the elderly are being forced to pay an increased portion of nursing home costs privately. In 1966, 80.42 percent of Nebraska's nursing home expenditures were paid with federal, state, or local government funds. By 1978 those governments were paying only 48.26 percent of the total nursing home expenditures in Nebraska. On a national level, government funding of nursing home expenses rose from 42.86 percent in 1966 to 53.67 percent in 1978. Total public funding of Nebraska nursing home expenses in 1978 was $50,149,000.

Whether the motive has been to reduce the cost of publicly funded nursing home expenditures or to minimize the increasing out-of-pocket expenses borne by the elderly and their families, state and federal governments have had

abundant incentive to attempt to cap rising nursing home costs. The conventional wisdom has been that nursing home costs are reduced by reducing the number of long-term-care beds. A surplus of beds burdens the public, whether they are in use or not. Someone must pay the overhead expense of maintaining the nursing home facility and staff, so the cost of empty beds is passed on to the public through the beds that are occupied. Further, there is a tendency to fill surplus beds with patients who do not necessarily need such a high level of care, thus increasing total nursing home expenditures. This phenomenon is referred to as overutilization.

In the broader field of general health care facilities and services, not limited to nursing home care, the Legislature has stated its purpose in the enactment of the Nebraska Health Care Certificate of Need Act:

> [T]o conserve the limited health care resources of personnel and facilities in order to provide quality health care to all citizens of the state, to minimize unnecessary duplication of facilities and services, to encourage development ·of appropriate alternative methods of delivering health care, to promote wherever appropriate a more competitive health care delivery system, to encourage the provision of high-quality health care which is available and accessible to all citizens of the state, and to maximize the effectiveness of expenditures made for health care.

Neb. Rev. Stat. § 71-5802 (Cum. Supp. 1984).

In the Nebraska Health Care Certificate of Need Act, the Department of Health is directed to provide criteria for the consideration of applications for certificates of need. The specific criteria ordered by the Legislature and pertinent to this case include (1) the need that the population to be served has for the service, (2) the availability of less costly or more effective alternative methods for providing the service, (3) the relationship of the proposed services to the existing health care system in the area, (4) the efficiency and appropriateness of using existing services and facilities, and (5) the relationship of the proposed services to the state health plan. §§ 71-5852, 71-5853, and 71-5854.

Pursuant to the statutory directive, the Department of Health adopted the following methods by which an applicant should demonstrate need for long-term-care beds:

<u>006.09 Long-Term Care Beds (Skilled Nursing Facility and Intermediate Care Facility Beds, Excluding ICF-MR Beds).</u>

<u>006.09A</u> The combined occupancy of long-term care beds in the applicant's service area must be 90 percent or greater before long-term care beds may be added.

<u>006.09B</u> A system of alternative services, including either home health services, home aide/homemaker services, or an adult day care center, must be accessible to a majority of the population in the service area of the proposed project before long-term care beds may be added.

<u>006.09C</u> . . . . No long-term care beds may be added if the number of beds in the applicant's service area exceeds the need for that area determined by aggregating the bed needs estimated for each sex and age group from the following methodology:

$$\text{Long-term Bed Need} = \frac{\text{Population} \times \text{Utilization Rate Goal}}{\text{Minimum Occupancy Rate Goal}}$$

<u>006.09C1</u> The population includes the total population of the applicant's service area, disaggregated by age (0-44, 45-64, 65-74, 75-84, 85+) and sex.

<u>006.09C2</u> The utilization rate is the number of long-term care residents per 1000 persons. The utilization rate goal for each sex and age group is as follows:

| Age-Sex | | Utilization Rate Goal |
|---------|--------|------------------------|
| 0-44 | Female | 0.10 |
| | Male | 0.11 |
| 45-64 | Female | 2.84 |
| | Male | 3.00 |
| 65-74 | Female | 14.87 |
| | Male | 13.81 |
| 75-84 | Female | 69.52 |
| | Male | 47.35 |
| 85 + | Female | 247.81 |
| | Male | 173.15 |

006.09C3 The minimum occupancy rate goal is 90 percent, the goal for the ratio of the total number of patient days to the total annual available bed days.

Neb. Admin. Code tit. 182, ch. 2 (1983).

According to the Department of Health, Grand Island's service area consists of four counties designated by the Department of Economic Development: Hall County, Hamilton County, Howard County, and Merrick County. The appellee suggests, however, that the service area would be better limited to Hall County, or to include more counties to the north, since review criteria instruct that the service area should be determined with emphasis on referral patterns and travel time and without strict observance of geographical or political boundaries. We will discuss the evidence in terms of both the four-county area and Hall County alone.

The Department of Health admits that Grand Island Health Care has satisfied the need criterion requiring that the combined occupancy of long-term-care beds in the service area be 90 percent or greater. Charts, exhibits 18 and 21, demonstrate that, with the exception of the Nebraska Veterans' Home in Grand Island, the 1983 occupancy rates of nursing homes in the four-county area have been almost 95 percent or more. The veterans' home, which is not open to the general public, was 91.8 percent full in 1983. Exhibits 18 and 21 are set out in full as follows:

Nursing Home Beds, Hall and Surrounding Counties, 1984

| County | City | Nursing Home | Licensed Beds | 1983 Percent Occupancy |
|---|---|---|---|---|
| Hall | Grand Island | Heritage Village, North | 97 ICF-I | 98.6 |
| | | Heritage Village, South | 98 ICF-I | 96.0 |
| | | Nebraska Vets Home | 414 SNF and ICF | 91.8 |
| | | Wedgewood | 71 ICF-I | 99.8 |
| | Wood River | West Hall County Good Samaritan | 65 ICF-I | 97.3 |
| Hamilton | Aurora | Hamilton Manor | 109 ICF-I | 98.7 |
| | | Bethesda Care Center | 45 ICF-I | 96.6 |
| Howard | St. Paul | Heritage Living Center | 74 ICF-I | 95.8 |
| Merrick | Central City | Bethesda Care | 72 ICF-I | 94.8 |
| | Palmer | The Coolidge Center | 38 ICF-I | 97.6 |

Bed Supply

| County | 1985 Population 65+ | Number | Beds/1,000 65+ |
|---|---|---|---|
| Hall | | | |
| Excluding Vets Home | 6,169 | 331 | 53.7 |
| With Vets Home | 6,169 | 745 | 120.8 |
| Hamilton | 1,309 | 154 (+45)* | 117.6 (152) |
| Howard | 1,135 | 74 | 65.2 |
| Merrick | 1,395 | 110 (+42)* | 78.9 (109) |
| Total (Exc. Vets Home) | 10,008 | 669 (+87)* | 66.8 (75.5) |

*Hospital ICF-I beds.

EXHIBIT
18 9?
12-4-84

SOURCE: Roster of Intermediate Care Facilities and Skilled Nursing Facilities (May 1984) and Nebraska Nursing Homes 1983.

EXHIBIT
21
12-4-84

Projected Residents in Need of Long-Term Care

(ICF and SNF)

| Age/Sex | Utilization Rate Goal* | Hall County | | Hamilton County | | Howard County | | Merrick County | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1985 | 1990 | 1985 | 1990 | 1985 | 1990 | 1985 | 1990 |
| 0-44 F | 0.10 | 1.8 | 1.9 | 0.3 | 0.3 | 0.2 | 0.2 | 0.3 | 0.3 |
| M | 0.11 | 1.9 | 2.1 | 0.4 | 0.4 | 0.2 | 0.2 | 0.4 | 0.4 |
| 45-64 F | 2.84 | 12.7 | 13.4 | 2.7 | 2.8 | 2.0 | 2.0 | 2.5 | 2.6 |
| M | 3.00 | 13.0 | 13.6 | 2.8 | 2.8 | 2.0 | 2.0 | 2.6 | 2.6 |
| 65-74 F | 14.87 | 28.2 | 28.4 | 5.5 | 5.8 | 4.6 | 4.6 | 5.7 | 6.2 |
| M | 13.82 | 20.2 | 21.9 | 4.3 | 4.8 | 4.1 | 3.8 | 4.5 | 4.7 |
| 75-84 F | 69.52 | 91.5 | 95.5 | 19.5 | 18.9 | 16.0 | 15.0 | 20.7 | 20.0 |
| M | 47.35 | 35.0 | 37.6 | 7.6 | 7.5 | 7.6 | 7.8 | 9.8 | 9.1 |
| 85+ F | 247.81 | 128.9 | 144.5 | 34.5 | 35.2 | 23.0 | 26.0 | 31.2 | 34.9 |
| M | 173.25 | 41.8 | 40.0 | 9.0 | 9.4 | 8.8 | 8.7 | 9.9 | 10.7 |
| Total | | 375.0 | 398.9 | 86.6 | 87.9 | 68.5 | 70.3 | 87.6 | 91.5 |

*Residents per 1,000 population group.

1985 Bed Need Determination

| | |
|---|---|
| Hall | 375.0 |
| Hamilton | 86.6 |
| Howard | 68.5 |
| Merrick | 87.6 |

Total Residents = 617.7 ÷ .90 (Occupancy Goal) = 686 beds

1990 Bed Need Determination

| | |
|---|---|
| Hall | 398.9 |
| Hamilton | 87.9 |
| Howard | 70.3 |
| Merrick | 91.5 |

Total Residents = 648.6 ÷ .90 (Occupancy Goal) = 721 beds

There also seems to be little dispute concerning the second regulatory need criterion, that of requiring alternative nonresidential services such as home health, home aide/homemaker services, or adult day care. Grand Island Health Care offered evidence that some such services are available and/or proposed. The Department of Health argues that the more available these services become, the less demand there will be for long-term residential care. The department does not, however, argue that the appellee failed to prove these services are available to the service area.

The major thrust of the Department of Health's appeal focuses on the third criterion, the methodology prescribed in regulation § 006.09C. Based on the 1980 census for the four-county area, the Department of Health has determined that the need for long-term-care beds in 1985 is 686. The need for 1990 is 721 beds. The supply of long-term-care beds in the four-county area is 756. Thus, the department argues, there will be no need for additional beds until well after 1990.

It is significant to note, however, that Hall County, where the proposed facility would be located, has a proportionately low ratio of long-term-care beds per elderly in comparison to the other counties in the four-county area. Including hospital beds certified for intermediate care that are open to the general public, but excluding the veterans' home in Grand Island which is not, Hall County has 53.7 beds per 1,000 county residents age 65 or over; Hamilton County has 152; Howard County has 65.2; and Merrick County has 109.

In its recommendation to the Certificate of Need Review Committee, the Department of Health calculated Hall County's need for long-term-care beds in 1985 at 416, using the methodology set out in the regulations. Noting that the existing beds in Hall County total 331, the department determined that there is a shortfall in that county of 85 long-term-care beds. By the same methodology it was determined that there is a surplus of 103 long-term-care beds in neighboring Hamilton County. The department's argument presumes that the Hamilton County surplus satisfies the need demonstrated in Hall County. It also presumes that families will be willing to move their elderly from Hall County to Hamilton County.

The Department of Health argues further that the application submitted by Grand Island Health Care should have been denied because it is inconsistent with the goals and objectives of the Nebraska State Health Plan 1982-1987 (Neb. Dept. of Health 1982). The more relevant provisions of that document include the following:

5.5.5.3 Goals and Objectives

GOAL 1 There should be an adequate supply of community and institutionally-based long-term care services to meet the needs of the population.

OBJECTIVE 1(A) By 1990, Nebraska should have no more than 73.8 long-term care beds (skilled and ICF) per thousand elderly. Until this objective is achieved, a moratorium should be placed on the construction of new long-term care beds except under extraordinary circumstances.

OBJECTIVE 1(B) Until 1990, when there is a surplus of long-term care beds for either level of care (skilled or intermediate) in a health service area . . . there will be no addition of long-term care beds.

OBJECTIVE 1(C) Until 1990, the combined occupancy of all long-term care beds in a health service area . . . must be 90 percent or greater before additional long-term care beds may be added.

. . . .

GOAL 2 Long-term care services should be provided at levels of care appropriate to patients' needs, and quality of care should be maintained.

GOAL 3 The combined occupancy of long-term care beds in a health service area . . . should be 90 percent or greater.

. . . .

GOAL 5 Skilled and intermediate care nursing services and community-based services should be available and accessible, in adequate numbers to meet the defined needs of the residents (especially Greater Nebraska).

OBJECTIVE 5(A) By 1984, identify [sic] the factors limiting access to skilled nursing care and alternative community-based services should be completed.

OBJECTIVE 5(B)  By 1985, a system of alternative services (i.e., congregate meals, home delivered meals, home health, home aide/homemaker, adult day care centers, transportation services, telephone reassurance services, protective services, and social services) should be available to encourage the highest feasible level of independent functioning for individuals in need of such services.

GOAL 6  Develop a comprehensive policy for long-term care in Nebraska, specifying alternative levels of care and the appropriate mix of long-term care beds (i.e., skilled and ICF).

*Id.* at V-447 to V-448.

The Department of Health argues that the moratorium set out in objective 1(A) is currently in effect, since the number of long-term-care beds per thousand elderly (65 and over) stands at 89. The moratorium is lifted only when long-term-care beds per thousand elderly falls below 73.8, or under extraordinary circumstances. Furthermore, when there is a need for skilled nursing beds, objective 1(B) establishes a preference for the conversion of intermediate-care beds to skilled nursing beds as long as there is a surplus of intermediate-care beds.

As alternative methods of satisfying the four-county area's need for skilled nursing beds, the Department of Health suggests that an existing intermediate-care facility convert some portion of its intermediate-care beds to skilled nursing. A certificate of need would be required, but the applicant would need to prove only that there was a need for additional skilled nursing beds, not additional long-term-care beds. Physical renovation of the existing intermediate-care facility would be unnecessary. The higher level of certification would require only additional staffing.

Another suggested alternative would be to convert existing acute-care hospital beds to skilled nursing. Hospitals with less than 50 beds may apply for the certification of swing beds. These beds may be used for either acute or long-term care. For hospitals with more than 50 beds, a designated long-term unit must be established. A certificate of need must be obtained for such a conversion.

In a large hospital the designated long-term unit must have

handrails installed in the corridors, and separate dining rooms and recreation areas must be established. No physical improvements are required for the certification of swing beds. Another advantage of converting hospital beds to long-term status is lower cost. The construction of a new long-term facility costs approximately $22,000 to $25,000 per bed, while the conversion of acute-care beds to long-term-care beds costs only $1,200 per bed.

One alternative that does not require a certificate of need is the addition of long-term-care beds to an existing long-term facility as long as the additional beds are no more than the lesser of 10 beds or 10 percent of the existing beds. Beds added under this rule cost approximately $10,000. The cost of these beds is less than that of new beds in a freestanding facility, since common areas, such as dining and recreation rooms, need not be added.

The only evidence admitted to prove that any party was interested in effectuating any one of the department's proffered alternatives was notices of intent to apply for certificates of need to construct 30 skilled nursing beds each as additions to the existing facilities, Heritage Village of Grand Island South and Heritage Village of Grand Island North. The mere filing of a notice of intent does not, of course, indicate that the facility will be built. Indeed, the Certificate of Need Review Committee rejected a similar project in a combined review with the instant application. As to the alternative of converting acute-care beds, the department produced no evidence that any hospital would be willing to convert to long-term care.

The appellant Department of Health's final argument is based on *Beatrice Manor v. Department of Health*, 219 Neb. 141, 362 N.W.2d 45 (1985). In that case we reviewed evidence that on a given date there were 20 residents in the Beatrice Manor service area (within 30 minutes' traveltime) waiting for placement in the facility. None of those individuals were certified by a physician as requiring placement, nor was there any evidence that they could not have been appropriately cared for with home nursing, day care, or other nonresidential forms of care. Only 2 of the 20 had had their names on the waiting list for the previous month, and there was no evidence that the

same names were not on waiting lists for similar facilities in the area. We stated:

> The evidence presented by Beatrice Manor confused "need" and "demand" for nursing beds. Under the department's guidelines they are not synonymous. "Need" focuses on long-range plans to provide required services to an entire population. It is a quantitative analysis. "Demand" connotes an immediate preference on the part of an individual to live in a particular nursing facility.

*Id.* at 149, 362 N.W.2d at 51. We found that Beatrice Manor had failed to demonstrate need and that a certificate of need could not be granted. The Department of Health argues in the present case that Grand Island Health Care has produced evidence of demand only, not need. We disagree.

Although the appellee has not demonstrated that the optimum 73.8 long-term-care beds per 1,000 elderly established by the Nebraska State Health Plan 1982-1987 (Neb. Dept. of Health 1982) has been achieved, the appellee has demonstrated "extraordinary circumstances" requiring an exception to the moratorium prohibiting additional long-term-care beds. Likewise, although Grand Island Health Care has not proved that the four-county area has a need for long-term-care beds under the sex and age specific utilization and minimum occupancy formula, Neb. Admin. Code tit. 182, ch. 2, § 006.09C (1983), the appellee has shown by a preponderance of the evidence that an exception to the requirement is justified as allowed by regulation, Neb. Admin. Code tit. 182, ch. 2, § 005.01B (1983).

Such exceptions to the regulations and state health plan were clearly anticipated by the Legislature in light of its amendment of § 71-5852, effective July 17, 1982. That amendment instructed the Department of Health to promulgate rules and regulations allowing exceptions to the state health plan "when justification is shown by a preponderance of the evidence." Grand Island Health Care met that burden before the review committee and the appeal panel.

The major thrust of Grand Island Health Care's evidence was that skilled nursing care is available in the four-county area

only to a small segment of the public. The only long-term-care beds licensed for skilled nursing in that area are those in the veterans' home in Grand Island and some swing beds in a Howard County hospital. Although the swing beds are accessible to the general public, there was evidence that one-half of all skilled nursing referrals are terminally ill and the other half are referred for rehabilitation. Since the Howard County hospital does not offer the therapy services required for rehabilitation, the swing beds are not an option for rehabilitative referrals. There was also evidence that Hall County families would be hesitant to move their terminally ill family members to another county where they would be far from their doctors, friends, and family.

Administrators from two Grand Island hospitals testified that their hospitals had difficulty placing patients in need of skilled nursing care. Kenneth Klausmeyer, the administrator of the Grand Island Memorial Hospital, testified that over a 6-month period in 1984 the hospital had made 135 contacts with nursing homes in efforts to place 12 skilled nursing and 37 intermediate-care referrals. These patients remained in the hospital a total of 53 additional days beyond when they would ordinarily have been dismissed, due to the difficulty in placement. When the hospital ultimately placed patients, it was sometimes as far away as Lincoln or Omaha. Klausmeyer admitted that the hospital had found it necessary to place patients in need of skilled nursing in facilities licensed only for intermediate care.

Michael R. Gloor, senior vice president of St. Francis Medical Center of Grand Island, testified that that hospital had also had to place patients in need of skilled nursing in intermediate-care facilities. St. Francis dismisses from two to three patients a month who need skilled nursing care, but the hospital is unable to find long-term care at that level in the area.

Gale D. Muller, vice president of SRI Research Center, Inc., testified to details of a study conducted by that company. During a 6-month study of patients discharged from Grand Island Memorial Hospital, 12 patients were recommended for skilled nursing care. An average of three contacts with nursing facilities were made before placement was made, and the

average distance from the patient's home to the nursing facility where placement was possible was 59.8 miles. Sixty-seven percent of those placed were placed over 30 miles from home, and 42 percent were placed approximately 100 miles from home. One-half of those patients recommended for skilled nursing care were placed in facilities licensed only for intermediate care.

A less formal study was conducted at St. Francis Medical Center. Over 3 months, 5 patients were recommended for skilled nursing and 33 for intermediate care. Annualizing the data for the two Grand Island hospitals, the SRI study concluded that there would be referrals from those hospitals of 44 patients per year in need of skilled nursing.

William E. Seim, an accountant specializing in the health care industry, testified that a change in medicare reimbursement has had a profound effect on the need for skilled nursing care. Medicare has established 468 diagnostically related groups (DRG), into which each patient's diagnosis must be categorized. Flat payments are made according to the appropriate DRG, creating an incentive for hospitals to discharge patients earlier than they might have in the past.

Medicare has also instituted professional review organizations (PRO), which are independent boards that review health service utilization with regard to individual patients. PROs may also reduce length of hospital stay and increase demand for skilled nursing. Seim explained that much of the disparity between need, as defined in the Nebraska State Health Plan 1982-1987 (Neb. Dept. of Health 1982), and that perceived by the health care personnel in the Grand Island area may be due to the fact that the state health plan was based on 1970 statistics when average length of hospital stay was 12 days. The current average length of stay since the institution of DRGs and PROs has been reduced to 4 days.

Once the appellee had demonstrated through this and other evidence that there were extraordinary circumstances requiring licensing of additional skilled nursing beds in the four-county area, it was still incumbent on Grand Island Health Care to show that its proposed project was the most efficient method of

satisfying the need.

> The applicant must demonstrate that the proposed project is the least costly of the alternatives for meeting the need established under part 005.01A above, or if it is not the least costly, that it is the most effective alternative for meeting such need. . . . The most effective alternative is the alternative which makes high-quality health care available and accessible to the greatest number of people in need of the services established as needed under part 005.01A above, maximizes the effectiveness of expenditures made for health care, minimizes unnecesssary duplication of facilities and services, encourages development of appropriate alternative methods of delivering health care, and promotes wherever appropriate a more competitive health care delivery system.

Neb. Admin. Code tit. 182, ch. 2, § 005-02A2 (1983).

Grand Island Health Care established that although there may be plausible and even preferable alternatives for satisfying the four-county area's need for skilled nursing beds, there is little probability that those alternatives will be effectuated.

The least expensive method of providing skilled nursing care in the four-county area would be for existing intermediate-care beds to be recertified for skilled nursing. When asked why the existing intermediate-care facilities in the area have not applied for recertification, Jack D. Vetter, president of Grand Island Health Care, Inc., testified that all the intermediate-care facilities have no interest in recertifying for skilled nursing.

Vetter also testified that recertification would not solve the need for skilled nursing beds even if an intermediate-care facility were willing to recertify. Those beds would still be filled with intermediate-care patients. The average length of stay in intermediate care is 4 years, so turnover would be very slow and the beds would not necessarily be open to newly referred, skilled nursing patients.

Seim testified that there are three types of disincentives to hospitals in the proposed alternative of converting acute-care beds to skilled nursing: staffing, financial, and architectural. Being accustomed to providing acute care, hospitals have a

tendency to overstaff for skilled nursing, thus reducing the profitability of providing skilled nursing care.

From the financial perspective, Blue Cross has intimated that it will institute a DRG program applicable to hospitals with less than 100 acute-care beds. Therefore, hospitals have been reluctant to reduce their number of acute-care beds. Another financial aspect was a distinction made by the State of Nebraska in medicaid payments, reimbursing hospital-based, long-term-care facilities $18 more per day than freestanding facilities. This distinction has been abolished recently, eliminating a former incentive for hospitals to provide skilled nursing care.

For hospitals, with less than 50 beds, that have been certified for swing beds, there is some concern that patients who are no longer eligible for skilled nursing care but develop another illness while still in the hospital for long-term care may not be eligible for medicare reimbursement for the second illness. This seems to be due to some loophole in the medicare regulations.

Swing beds are not always profitable ventures for hospitals. The State of Nebraska has authorized the payment of $38 a day for swing beds. If the cost of staffing an individual bed exceeds $38 per day, the hospital would do better to let the bed stand empty. Since one-half of skilled nursing patients require rehabilitative therapy, it is not difficult to imagine the case where personnel expenses would exceed $38 a day.

Architectural disincentives vary according to the hospital facility. For hospitals with more than 50 beds, a designated unit must be established for long-term-care beds. That unit must have a separate nursing station, dining room, and recreation area. Thus, the recertification of acute-care beds in a large hospital is not a matter to be taken lightly nor to be accomplished quickly.

Klausmeyer testified that Grand Island Memorial Hospital had rejected the idea of converting its acute-care beds to long-term for fear of changing its status with Blue Cross as a 100-bed hospital. Furthermore, a small, long-term-care unit would have required two nursing stations, too large a portion of the existing facility. The conversion would have reduced the income on a significant number of the existing beds.

Klausmeyer felt that maintaining the acute-care certification was a better utilization of the beds.

St. Francis Medical Center would be unable to convert its acute-care beds to long-term care without major structural renovations. Its current facility has only private rooms which are smaller than the space requirements for nursing home beds. Conversion to long-term care would require the gutting of a wing. Gloor also testified that the administration of St. Francis foresees no reduction in demand for acute care; its existing beds will be used at their current level of certification.

Having reviewed the evidence, we find that Grand Island Health Care, Inc., has proved need due to extraordinary circumstances in the four-county area. The appellee has also established that among the alternative methods of satisfying the need for skilled nursing beds in that area, the proposed project is the most likely to come to fruition and actually satisfy the need.

Although the Department of Health might prefer another alternative, the certificate of need system is dependent in part on the whim of private industry. There is no legal mechanism by which the state may force private enterprise to satisfy a public need by a preferred method. Since the appellee has demonstrated that the Department of Health's preferred alternatives are unlikely to be instituted, the paramount concern of this court must be that the identified need be satisfied. The appellee's proposal satisfies the need for skilled nursing beds in the four-county area in an acceptable manner.

In an appeal of a decision to grant a certificate of need, the party appealing that decision shall bear the burden of proof that the application does not meet the applicable criteria. Neb. Rev. Stat. § 71-5865 (Cum. Supp. 1984). Our review of the Department of Health's evidence and arguments shows that the appellant has not met its burden of proof. We affirm.

AFFIRMED.