WALTER D. MONIE, APPELLEE, V. STATE PERSONNEL BOARD ET AL., APPELLANTS.

424 N.W.2d 874

Filed June 24, 1988.   No. 86-638.

Robert M. Spire, Attorney General, and Charles E. Lowe for appellants.

Ray Simon, of Tietjen, Simon & Boyle, for appellee.

BOSLAUGH, WHITE, and SHANAHAN, JJ., and GITNICK and GARDEN, D. JJ.

BOSLAUGH, J.

This is an appeal from the order of the district court reversing the order of the Nebraska State Personnel Board, which affirmed the order of the director of the Department of Correctional Services terminating the employment of the plaintiff, Walter D. Monie, and reinstating the plaintiff to his employment with backpay. The appellants are the State Personnel Board; the Department of Personnel, State of Nebraska; the Department of Correctional Services; and Frank O. Gunter, Director, Department of Correctional Services, State of Nebraska.

The plaintiff, Monie, was employed as a Facility Service Technician III at the Omaha Correctional Center (OCC). Previously, Monie had been employed as a building contractor in McCook, Nebraska. Apparently, his duties at OCC related primarily to construction and maintenance work.

On August 23, 1985, Monie and his crew of residents from OCC were involved in doing cement work. Throughout the record, the prisoners or inmates at OCC are referred to as residents. Monie told Patrick Baber, one of the residents and a member of his crew, to carry some 12-foot-long 2 by 4s to another area. The resident picked up the lumber, which swung around and came in contact with Monie's chin, cutting it and causing it to bleed. Monie testified that the resident did it like it was on purpose. However, a carpenter supervisor, Jon Mitchell, who witnessed the incident, testified that he did not believe the resident was trying to hit Monie, but that it was an accident. Painting supervisor Richard Jorgensen testified that he did not actually see the lumber hit Monie, but he did state in an incident report he filed that the incident occurred while the resident was carrying the wood out of the building, that the area is congested, and that it is a tight squeeze to get any material in or

out of the building. The parties have stipulated that Monie's chin was cut or scratched and that it bled. Mitchell testified that Monie pushed and kicked the resident and said, "You son-of-a-bitch, you tried to hit me on purpose." The resident continued toward the door with the 2 by 4s, dropped the 2 by 4s, and turned to Monie and said, "If you ever lay a hand on me again, I'll have to bust you in the mouth." Monie walked up to the resident, put his stomach against the resident, and began pushing him with his stomach and saying, "Go ahead and hit me." He continued to shove the resident with his stomach for several minutes. The resident kept repeating, "If you lay a hand on me, I'm going to." Monie then walked over to a cooler, which was approximately 4 to 5 feet away, filled a glass with Kool-Aid from the cooler, and threw it on the resident. He refilled the glass and threw another glass of Kool-Aid on the resident, and then repeated this a third time. Mitchell testified that the resident acted very carefully not to shove or hit Monie in any way and that the resident kept his hands directly down by his sides.

Monie told the resident that he was taking him to the lieutenant's office and proceeded to try and get hold of the resident. Jorgensen intervened and told Monie two or three times to go to the lieutenant's office by himself.

As a result of the incident with Baber on August 23, Monie was suspended pending completion of an investigation. A statement of charges was served on August 26, and a hearing was had on August 27. Following the hearing the superintendent of OCC recommended that Monie be discharged. The recommendation was approved by the director on August 28, and in a letter dated September 5 Monie was notified that he was terminated.

Monie then filed a grievance. A hearing was held on September 30, and the committee recommended that the termination be upheld. This was approved by the director on October 7. Monie then appealed to the State Personnel Board.

A hearing was held before a hearing officer on December 3, 1985, who on January 13, 1986, recommended that Monie be reinstated with backpay to the date of suspension. The personnel board voted 3 to 1 to not concur in the findings and

conclusions of the hearing officer, and affirmed the order of the agency head, the director. On February 12 Monie filed a petition on appeal in the district court under Neb. Rev. Stat. § 84-917 (Cum. Supp. 1984).

Our standard of review of the district court's decision is de novo on the record made before the personnel board. *Department of Health v. Columbia West Corp.*, 227 Neb. 836, 420 N.W.2d 314 (1988); *Meier v. State*, 227 Neb. 376, 417 N.W.2d 771 (1988); *Haeffner v. State*, 220 Neb. 560, 371 N.W.2d 658 (1985). Therefore, we make independent findings of fact without reference to those made by the agency whose action is being reviewed, *Meier v. State, supra*, and *Department of Health v. Grand Island Health Care*, 223 Neb. 587, 391 N.W.2d 582 (1986), and reach our decision independent of all dispositions that have gone before. *Department of Health v. Columbia West Corp., supra*. Where the evidence is in conflict, the Supreme Court will consider and may give weight to the fact that the agency or hearing officer observed the witnesses and accepted one version of the facts rather than another. *Dieter v. State*, 228 Neb. 368, 422 N.W.2d 560 (1988).

A central issue in the case now seems to be a claim by Monie that he was suffering from the effects of an exposure to tear gas on the day preceding the incident with Baber and, therefore, should not be held responsible for his conduct.

The record shows that on August 22, 1985, Monie took part in a training exercise of OCC's emergency REACT team, which is designed to respond to institutional disturbances. The training exercise involved the use of chemical agents, including two types of tear gas. During the exercise Monie was exposed to tear gas at a time when he was not wearing his gas mask. Monie testified that he washed his eyes with water because he could hardly see, and then started to walk around in an attempt to clear his mind and get the agent out of his system. He made no complaint to the training officer about his exposure to the gas. At the end of the training exercise he returned to the institution, but did not attempt to wash off the agent. Instead, he went home and took a shower, and described himself as feeling very lousy and sick in the head, as if he was on "a cheap drunk."

That evening Monie received a phone call indicating that

there was a problem with one of the air-handling units at OCC. Because he was the maintenance person on duty, he went to OCC to check on the problem. At that time he was still feeling very ill and disoriented, but felt it was his duty to go. He began working on the problem, which required a key for entry into the necessary panel. Jim From, an engineer at OCC, received a phone call from Monie that evening indicating that he did not have the correct key. From testified that Monie should have had the correct key on his own keyring. From told him to go get From's set of keys because he knew the correct key would be on there. Monie got From's keyring, climbed up a ladder to the panel, but again could not find the correct key. He called From back and told him he did not have the correct key on From's keyring either. From replied that the correct key had to be on it because he had used it himself earlier that afternoon. Monie testified that he made three or four trips up the ladder before he discovered the correct key was on From's keyring. The correct key was also on his own keyring. Monie felt it was unusual that he had not been able to locate the correct key, and felt that something was wrong.

He returned home and tried to go to sleep, but could not do so because he was coughing severely. The next morning he still felt like he was on "a cheap drunk," but did not call in sick. He decided that since it was a Friday, and because he had work that needed to be done, he would go in and then recuperate over the weekend. The incident with Baber occurred that morning.

Monie testified that he remembered being hit in the chin, but that the next thing he remembered was trying to get the resident to follow him to the lieutenant's office. He does not recall kicking, shoving, or throwing Kool-Aid on the resident. Monie was suspended without pay pending an investigation.

That evening Monie continued to cough and have difficulty breathing. The next day, Saturday, August 24, Monie contacted William Stump, the training officer, and told him he was having problems with his breathing. He asked Stump whether anyone else on the REACT squad had experienced or mentioned such a difficulty. Stump replied that he had not heard of any other problems and advised Monie to see his doctor. Monie then went to Methodist Hospital and described his exposure to the gas. He

was told that his lungs were inflamed, as was the lining to the air ducts going down to the lungs, and that the inflammation was due to exposure to the gas. He received medication and was told to see his own doctor on Monday if his problems continued.

On Monday morning, August 26, 1985, Monie attended a preinvestigation meeting at OCC. It was at this time that he first heard the allegations of kicking, shoving, and Kool-Aid throwing. He then became aware of his memory loss, because he had no recollection of those actions. Monie was informed that his actions were in direct violation of Neb. Admin. Code tit. 273, ch. 16, §§ 001.01 and 001.14 (1983), which allow disciplinary action to be taken for "[v]iolation of, or failure to comply with, State constitution or statute; an executive order; published rules, regulations, policies or procedures of the employing agency or the State of Nebraska Personnel System" and for "[i]nsubordinate acts or language which seriously distract from the respect due the senior authority of a senior person or severely hamper the agency's ability to control, manage or function."

In addition he was charged with violation of the Department of Correctional Services administrative regulation No. 112.31, which, in part, prohibits the use of profanity or abusive language while giving orders to inmates, and prohibits corporal punishment or unreasonable force when dealing with an inmate, and with violation of OCC operational memorandum No. 116.1.0006, defining corporal punishment as

[a]ny striking, pushing or shoving of an individual for the purpose of causing pain and/or discomfort; the improper use of chemical agents or instruments of restraint; violence of any nature; the use of profane or abusive language or any measure which, by commission or omission, may be injurious to an individual.

After this meeting Monie visited his physician, Dr. Dean K. Wampler, who put him on a different medication. During this visit Monie did not mention the incident with the resident to Dr. Wampler.

A hearing was held the following day, Tuesday, August 27, 1985. Monie had been advised by a letter dated the previous day that he would be given an opportunity to present mitigating

evidence on his own behalf at the hearing. At the end of the hearing Monie was asked by Karen Shortridge, superintendent of OCC, whether he had anything he would like to add. Monie responded that he would choose to get off the REACT team because he felt it had affected him. Monie did not mention any specific effects of the gas, and no other discussion was had regarding the matter.

Following this hearing, Shortridge recommended to Frank Gunter, the director of the Department of Correctional Services, that Monie's employment be terminated. She based her recommendation on the seriousness of the incident and on the fact that Monie had a history of problems with his temper while employed at OCC. That history included a situation in which Monie shoved and yelled at a resident, and a situation in which Monie became upset while pouring concrete and threw a shovel head and shovel handle, narrowly missing bystanders. Both of these incidents occurred approximately 2 months prior to the incident at issue. As a result of these incidents, Monie received counseling from Roger Grant, building super-intendent, and was given instruction regarding alternative methods of venting his feelings and dealing with residents by means other than physical force. Shortridge also based her recommendation of termination on her concern that Monie's continued employment would create a situation of potential liability on the part of OCC. That recommendation was approved by Gunter on August 28, 1985. Shortridge then realized that she had failed to inform Monie that he could submit a statement of mitigation to be attached to her letter of recommendation to the director, and informed Monie that he had 2 days to submit any such evidence.

In the meantime Monie had discussed the incident with Dr. Wampler, who agreed to do some checking on whether Monie's conduct could have any connection with his exposure to the gas. In a letter to Shortridge dated August 30, 1985, Dr. Wampler stated:

> On the visit of August 29th he [Monie] related to me the incident of Friday, August 23rd, when he allegedly mistreated an inmate. He relates to me the fact that he has little recollection of the incidence [sic], and what he does

remember, does not fit the description of other witnesses. This, of course, you all know.

My concern is that Mr. Monie may well have been mentally impaired on Friday, the 23rd, because of his acute respiratory illness related to the tear gas exposure. The chemicals used in tear gas obviously cause a rather severe irritation of the respiratory mucous membranes which is how they work. However, Mr. Monie had a severe reaction to the irritation setting up the asthmatic and bronchospastic problems. Although it is impossible to document at this time, it is quite probable that Mr. Monie could have been suffering from not enough oxygen supply to the brain on the 23rd, 24th, and 25th to cause an element of confusion and disorientation.

Please consider this in your actions regarding Mr. Monie, and if you have any questions regarding this situation, please feel free to call.

Shortridge testified that upon receiving this letter, she asked William Stump, the training officer, to obtain reports from the chemical company on whether the gas could affect a person in such a way. She also called the Omaha Police Department "to see if there could be anything more that I should be aware of." The record does not indicate what response she received from the Omaha Police Department. In a report by Stump dated September 5, 1985, he indicated that he had, on September 3 and 5, contacted Smith & Wesson, the manufacturer of the chemical agents used during the REACT exercise, and advised it of the allegations made by Monie regarding their effect. The product manager's office of Smith & Wesson advised Stump that no side effects that would alter behavior or impair judgment had ever been noted or proven and that it would send Stump some governmental investigative reports on any side effects of the agents.

On September 4, 1985, before receiving that additional information, Shortridge again recommended to Gunter that Monie's employment be terminated. She testified that she had again recommended termination because Monie had not seen a doctor prior to the incident with the resident, because Monie appeared coherent, and because of the information she had

received regarding the effect of the gases. Following approval of the termination by Gunter, Monie was informed in a letter dated September 5, 1985, that his employment had been terminated.

In addition to the foregoing evidence, the personnel board received into evidence an unsworn affidavit from Dr. Wampler, which was not dated, but was prepared at some time after the termination. In that letter Dr. Wampler stated:

> Because of my concerns about Mr. Monie's tear gas exposure and severe ill effects, I did more research into the toxic effects of tear gas preparations in general. The compounds of specific concern were chloracetophenone, orthochlorobenzalmdnitrile [sic], and trichloronitromethane. The specific texts with the most information include "Clinical Toxicology of Commercial Products", authors being Gosselin, Hodge, Smith, and Gleason and also the "Handbook of Emergency Toxicology, Fourth Edition" (1980 by Sidney and K).
>
> These texts describe rather vague and toxic effects of these compounds, mainly because severe reactions are rather unusual. However, these compounds are known to cause rather severe pulmonary toxic side effects with severe irritation, bronchospasm, and other toxic effects resembling chlorine gas. These effects include pulmonary edema, bronchial congestion, bronchitis, asphyxia, cyanosis, and in the most extreme case, of course, death.
>
> In treating Mr. Monie it has been my firm opinion since my discussion with him on August 29 that his problems with temper control and behavior on August 23 directly relate to the toxic side effects of the chemicals he was exposed to as well as their medical effects on his system. I believe his pulmonary side effects and congestion were bad enough to impair oxygen transport and, therefore, a condition of hypoxia or inadequate oxygen supply to the brain and other tissues. This would produce a state of essential involuntary toxication which would impair judgment and control.

After considering the evidence, the hearing officer prepared a recommended decision for the State Personnel Board in which he recommended that Monie be reinstated with full

backpay. He based his decision on the fact that he felt the affidavit of Dr. Wampler should carry considerable weight, and for the reason that the agency terminated Monie's employment without conducting a thorough investigation. The personnel board disagreed, and affirmed Monie's termination.

The scope of review of the personnel board is to decide whether the decision to terminate was made in good faith and for cause, and to assure that the agency head followed proper procedures under state personnel and/or agency rules and regulations, labor agreements, or relevant statutes. Neb. Admin. Code. tit. 273, ch. 17, § 008.03M (1983).

With the exception of Dr. Wampler's opinion, all of the evidence in regard to Monie's intoxication from exposure to the tear gas comes from Monie. None of the other personnel who were exposed to the gas experienced such a reaction, and what little evidence there is suggests that such a reaction would be rare and highly unlikely. The persons who observed Monie on August 23 said that he appeared to be normal.

A significant factor in this case is Monie's history of temper outbursts and his inability to control his temper despite previous warnings and counseling.

In her letter of September 12, 1985, to the director, in commenting on Monie's allegation that his termination was inconsistent with similar incidents at OCC, the superintendent stated: "In Mr. Monie's case, the incident was preceded by weeks of harassment by his inmate crew which Mr. Monie failed to handle. Also, Mr. Monie has a documented history of temper problems, including a previous incident (see formal counseling report of June 25, 1985)."

From our de novo review of the record we conclude that the decision to terminate the employment of the plaintiff was made in good faith and for cause and that the agency head followed proper procedures under the relevant state personnel and agency rules and regulations and statutes.

The judgment of the district court is reversed and the cause remanded with directions to enter judgment dismissing the petition.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.