DEPARTMENT OF HEALTH, STATE OF NEBRASKA, APPELLANT, V. OMAHA ASSOCIATES, A LIMITED ILLINOIS PARTNERSHIP, ET AL., APPELLEES.

441 N.W.2d 579

Filed June 16, 1989.   No. 87-715.

Robert M. Spire, Attorney General, and Marilyn B. Hutchinson for appellant.

Joseph E. Casson and Beverly Petersen Jennison, of Casson, Harkins & LaPallo, and John R. Holdenried and Barbara E. Person, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellees.

HASTINGS, C.J., SHANAHAN, and FAHRNBRUCH, JJ., and NORTON, D.J., and RONIN, D.J., Retired.

SHANAHAN, J.

Omaha Associates, a limited partnership in the State of Illinois, and Aksarben Nursing Centers, Inc., a Minnesota corporation, appellees, seeking approval of the simultaneous purchase and lease of the 174-bed Omaha nursing home facility of The Hillhaven Corporation, filed an application with the Department of Health (department) requesting the issuance of a certificate of need (CON), which, by virtue of Neb. Rev. Stat. § 71-5830(1) (Reissue 1986), was required for the proposed transaction. Accepting the department's recommendations, the CON review committee denied the appellees' application for a

CON. Appellees then appealed to the CON appeal panel. See Neb. Rev. Stat. § 71-5860 (Reissue 1986). The parties stipulated that the issues before the appeal panel were whether the appellees had met their burden to prove: (1) that the proposed project was the least costly or most effective alternative; (2) that the increase in costs, if any, was justified in part by improvements in the financing and delivery of health services which would foster competition and promote quality assurance for consumers; (3) that financing was available and the project was financially feasible; (4) that the proposed project was designed to provide or support high quality care; and (5) that the proposed project would foster competition and increase the range of choices available to consumers. Based on these issues, the CON appeal panel reversed the decision of the CON review committee and granted the requested CON. Pursuant to Neb. Rev. Stat. § 71-5866 (Reissue 1986), the department appealed to the district court for Lancaster County, which affirmed the decision of the CON appeal panel and issuance of a CON to the appellees. In its appeal to this court, the department claims that (1) the CON appeal panel exceeded its statutory authority and jurisdiction, (2) the appeal panel's decision is unsupported by appropriate evidence, (3) the decision of the appeal panel is contrary to law, and (4) the decision is arbitrary and capricious.

STANDARD OF REVIEW AND BURDEN OF PROOF

The department's appeal from a decision of the CON appeal panel, which has granted a CON, is governed by the Administrative Procedure Act. § 71-5866. In an appeal to the Supreme Court from an administrative agency's decision, the Supreme Court tries factual questions de novo on the record and reaches a conclusion independent of the conclusion reached by the administrative agency, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the administrative agency heard and observed the witnesses and accepted one version of the facts rather than another. See, Neb. Rev. Stat. § 84-918 (Reissue 1987); *Department of Health v. Grand Island Health Care*, 223 Neb. 587, 391 N.W.2d 582 (1986); *Department of Health v. Columbia West Corp.*, 227

Neb. 836, 420 N.W.2d 314 (1988).

Because our review is de novo, we bear in mind the burden of proof when a CON has been issued. "In an appeal of a decision to grant a certificate of need, the person appealing that decision shall bear the burden of proof that the application does not meet the applicable criteria." Neb. Rev. Stat. § 71-5865 (Reissue 1986); *Department of Health v. Grand Island Health Care, supra*. Hence, the department has the burden of proof in the present case, namely, the burden of establishing that the applicants appellees have not satisfied the requirements for a CON.

## THE FACTS

Hillhaven, the current owner-operator of the 14-year-old nursing home facility which appellees seek to purchase and lease, acquired the facility in 1978 for a purchase price of $2.3 million. Dating back to November 1983, Hillhaven has had a somewhat strained relationship with the department. On February 14, 1985, the department's director issued a 10-page citation to Hillhaven, severely criticizing Hillhaven's care of its residents and the sanitary conditions within the nursing home facility. As a basis for the departmental citation, the department's director noted observations by the department's "surveyors," apparently a euphemism for *inspectors*, which included improper care of incontinent patients, haphazard and improper positioning of patients, presence of numerous cockroaches within the facility, improper food preparation, and inadequate staffing. As a result of the alleged violations, the department prohibited admission or readmission of patients to Hillhaven.

On February 25, 1985, the department, on account of the violations alleged against Hillhaven, filed a petition to place Hillhaven in the hands of a receiver. This action was unsuccessful. Hillhaven continued as the operator of the nursing home and took action to remedy the violations or deficiencies alleged by the department. On April 10, 1985, the department withdrew its allegations against Hillhaven and permitted admission of residents to the nursing home. On that same day, however, the department issued a new citation to

Hillhaven documenting further deficiencies in the operation of the nursing home.

After the department lifted the ban on admissions, Hillhaven unilaterally restricted admissions to avoid further action by the department. Disputes with the department regarding the level of care provided by Hillhaven apparently had drastic effects on Hillhaven's profitability. In 1984-85, Hillhaven sustained "large financial losses."

In May 1986, Hillhaven contracted to sell its nursing home facility to Zev Karkomi, who in turn assigned his contractual interest to Omaha Associates, a partnership composed of Karkomi and Harvey Angell. Omaha Associates then leased the nursing home facility to Raymond Tutwiler, who assigned his leasehold interest to Aksarben Nursing Centers, a corporation formed by Tutwiler. Aksarben proposed to contract with RET & Associates, another entity operated by Tutwiler, for management services in the Hillhaven facility. Both Tutwiler and Karkomi have extensive experience with nursing home operations.

Karkomi proposed to pay Hillhaven $3.3 million for the land, building, and equipment, plus $50,000 for Hillhaven's inventory and an additional $150,000 in consideration of Hillhaven's promise not to compete. Omaha Associates gave Hillhaven a promissory note for $3.1 million, which was secured by a mortgage to Hillhaven. Omaha Associates' note bore a variable interest rate, ranging from 10.68 percent in the initial year to 13.12 percent in subsequent years for the note, which resulted in monthly payments ranging from $27,582.46 to $33,130.56. At the end of 15 years, Omaha Associates' note called for a balloon payment in the amount of $3,145,631. The note further provided that Omaha Associates had the option of prepayment without penalty at any time. Omaha Associates' lease to Tutwiler had a 10-year term with annual rent varying from $381,060 in the 1st year to $455,401 in the 10th year and obligated the lessee to pay "all taxes, assessments, licenses and permit fees, charges for public utilities, and all governmental charges." The Tutwiler lease also restricted the use of the premises to "skilled care and/or intermediate care nursing home" and required that the lessee maintain good standing with

the department. Tutwiler subsequently assigned his leasehold interest to Aksarben Nursing Centers, which intended to hire RET & Associates, a nursing home management company, to handle the operation of the Hillhaven facility. All the transactions, however, were conditioned on appellees' success in acquiring a CON.

Meanwhile, the financial losses and problem care persisted at Hillhaven. In October of 1986, Hillhaven sustained a loss in excess of $47,000. Hillhaven's average nursing hours per resident per day were 3.9, when the average for nursing homes in the state was 2 to 2.5. Notwithstanding the greater than average nursing hours per resident, the general quality of nursing care for Hillhaven's residents was inferior by the standards of the department. Hillhaven's present management had difficulty in providing adequate care even though Hillhaven had a relatively low occupancy rate. In spite of Hillhaven's efforts, including $350,000 for capital improvement of its facility, the department remained dissatisfied with the management of the nursing home and issued a "Statement of Deficiencies" to be corrected by Hillhaven as a result of an October 1986 state inspection. At the time of the hearings on the requested CON, however, Hillhaven was under no sanctions by the department.

At the hearings before the CON review committee and appeal panel, appellees maintained that new management of the Hillhaven facility would restore profitability to the operation and provide high quality care to Hillhaven's residents. Tutwiler believed that the facility was in a good location, adjacent to Bergan Mercy Hospital, and was, therefore, attractive to the private sector in need of a nursing home. Tutwiler testified that, although the facility would be burdened with additional capital costs as a result of the purchase, the savings that new management could implement in the operational area, along with an increase in revenue attributable to a modestly higher occupancy rate, would result in a private pay patient rate increase no greater than a rate increase planned by Hillhaven.

Regarding medicare, Tutwiler indicated that the appellees would increase the beds allocated to medicare utilization from

10 beds to approximately 25 and would accept residents who required skilled care but who had been previously denied admission at Hillhaven. The increased utilization would cause a decrease in Hillhaven's medicare rate, which exceeded $100 per day, to approximately $75 per day.

APPLICABLE CRITERIA FOR ISSUANCE OF A CON

The review criteria at issue in appellees' application for a CON are found in 182 Neb. Admin. Code, ch. 2, § 005 (1983). The department admitted that because the proposed transaction involved the purchase of an already existing nursing home, the applicants were not required to establish an unfulfilled need for the proposed services at the Hillhaven facility. Instead, the department contends that the appellees' application for a CON should be denied because appellees have not met the following requirements in the department's rules for issuance of a CON:

005.02A Alternatives.

. . . .

005.02A2 The applicant must demonstrate that the proposed project is the least costly of the alternatives for meeting the need established under part 005.01A above, or if it is not the least costly, that it is the most effective alternative for meeting such need. . . .

005.02B Cost.

005.02B1 Any increase in costs or charges (to any class of payers or to all payers) resulting from the proposed project must be justified by the needs of the population established under part 005.01A above which will be met by the project. In estimating increases in costs or charges which will result from the proposed project, capital costs, operating costs, projected utilization of the proposed services, and any other factors bearing on future costs or charges shall be considered.

005.02B2 Increases in costs may be justified in part where improvements or innovations in the financing and delivery of health services will foster competition and promote quality assurance and cost effectiveness for consumers and payers.

005.02C Financial Feasibility.

005.02C1 The resources and proposed means of financing the proposed project must in fact be available.

005.02C2 It must be reasonably certain that the proposed project will be financially feasible for the period of life of the assets.

005.02D Continuity and Quality.

. . . .

005.02D4 The proposed project must be designed to provide or support high quality care. The quality of care provided by the applicant in the past may be considered in determining whether high quality care will be provided by the proposed project.

. . . .

005.02F Competition/Sharing.

005.02F1 Except as provided in subparts 005.02F2 and 005.02F3 below, the proposed project must increase the range of choices available to consumers and third-party payers with respect to the price and use of services, and must have the effect of fostering price competition among providers of health services.

005.02F2 In the case of leases or acquisitions of existing health care facilities, except as provided in subpart 005.02F3 below, the proposed lease or acquisition must not have the effect of reducing price competition among providers.

005.02F3 Where it is demonstrated that competition would not serve to promote quality assurance and cost effectiveness, the proposed project must optimize sharing and minimize unnecessary duplication in the health care delivery system.

To qualify for a CON, the applicant must meet all of the applicable criteria. § 005. Therefore, we must examine each of the preceding criteria to determine whether the department has met its burden to show that the appellees have failed to satisfy the requirements to obtain a CON.

## Alternatives

At the administrative level, appellees disputed the applicability of § 005.02A2 concerning alternatives to the proposed plan. The appeal panel found that the criterion was applicable and satisfied by appellees. On appeal, the department contends that the criterion was not met.

After briefs were filed in this appeal, we decided *Department of Health v. Columbia West Corp.*, 227 Neb. 836, 420 N.W.2d 314 (1988). *Columbia West* involved the proposed purchase of an already existing nursing home and, in that respect, is similar to the case now before us. In *Columbia West*, as here, showing an unfulfilled need was not a prerequisite to issuance of a CON involving an existing nursing home. After noting that "§ 005.02A2 appears to be primarily concerned with new construction projects," we held "that where, as here, the need for an existing health care facility is not disputed and a willing buyer and a willing seller have agreed upon a price for that facility, § 005.02A2 is not a relevant review criterion in the application for a certificate of need." 227 Neb. at 840, 420 N.W.2d at 316-17. Therefore, in view of *Columbia West*, we will not concern ourselves with whether the proposed project is the least costly or most effective alternative.

## Potential Increase in Costs

While appellees contend that private pay rates will increase no more than the current owner proposes, medicaid costs after the purchase will increase by about $3.60 per day. However, appellees' application also indicates that they plan to implement a number of new programs, including an Alzheimer's disease unit, improved physical therapy, and a respiratory therapy unit. Furthermore, given Hillhaven's history of problems and the complaints by the department, a change in management apparently will be conducive to improved quality of care for the nursing home residents. Consequently, we find that any increase in the cost is justified by the innovations in delivery of health care planned by appellees.

## Financial Feasibility

Appellees propose to purchase a facility valued near $4.4

million for $3.3 million. The appellees have demonstrated that financing is available as the result of the secured note in favor of Hillhaven. In view of the lease, which will produce rental revenues for Omaha Associates sufficient to satisfy the monthly payments on the Hillhaven note, the project appears reasonably financially sound for Omaha Associates. Without examining in detail the qualifications of those operating Aksarben Nursing Centers and RET & Associates, we find that the planned increase in facility efficiency and the proposed increase in occupancy make it reasonably certain that the project will be financially feasible. Therefore, the appellees have satisfied the criterion in § 005.02C.

### Continuity and Quality

Tutwiler, the president of RET & Associates, has 16 years of experience in the nursing home industry, including 8 years of upper-level management experience. Pat Edwards, RET & Associates' proposed "quality assurance nurse" for the facility, has experience as a state surveyor for the department, teaches nursing courses for the state, and has served as quality assurance director for two large nursing home operations. On the basis of the information presented, we find that the operational and managerial experience of RET & Associates, coupled with the new services planned at Hillhaven, meet the requirement that the proposed project is designed to provide high quality care.

### Competition

Because the transaction at issue in the present case involves the acquisition and lease of an existing health care facility, only §§ 005.02F2 and 005.02F3 of the department's rules may be pertinent. Neither the department nor the appellees claim that competition would be detrimental to the nursing home's quality assurance or cost effectiveness. Therefore, § 005.02F3 is inapplicable. To satisfy the competition criterion (§ 005.02F2), the proposal "must not have the effect of reducing price competition among providers." Higher quality care at Hillhaven would quite likely become a matter of substantial interest to other nursing homes in the area which hope to attract or retain residents. Factors which will likely influence a

prospective nursing home resident to choose one facility over another include the cost and quality of care at any given facility. Rather than reduce price competition among nursing homes, we find that appellee's prospective activity and operation at the Hillhaven facility will not adversely affect price competition. Therefore, the appellees have met the competition criterion.

As a result of the analysis above, we conclude that the department has failed to meet its burden of proof and, therefore, the department's assigned errors are without merit. See § 71-5865. Thus, we reach the same conclusions reached by the district court. The judgment of the district court, affirming the CON appeal panel's order and decision that the appellees have satisfied the applicable requirements for issuance of a CON, is affirmed.

AFFIRMED.