DEPARTMENT OF HEALTH OF THE STATE OF NEBRASKA, APPELLANT, v. LUTHERAN HOSPITALS AND HOMES SOCIETY OF AMERICA, A NONPROFIT CORPORATION, DOING BUSINESS AS GRAND ISLAND MEMORIAL HOSPITAL, GRAND ISLAND, NEBRASKA, APPELLEE.

416 N.W.2d 222

Filed December 11, 1987.   No. 86-129.

Robert M. Spire, Attorney General, and Marilyn B. Hutchinson, for appellant.

William H. Lewis, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

PER CURIAM.

The applicant, Lutheran Hospitals and Homes Society of America, doing business as Grand Island Memorial Hospital, filed an application for a certificate of need for the acquisition and installation of a linear accelerator and for development of radiation therapy services. The Nebraska Department of Health recommended denial of the application. The Certificate of Need Review Committee found that the applicant had failed to demonstrate that the proposed project met the review criteria specified in Neb. Admin. Code tit. 182, ch. 2, § 005 (1983), and denied the application. The applicant then appealed to an appeal board of the Nebraska Certificate of Need Appeal Panel, which reversed the decision of the review committee and approved the application. The appeal board's decision was affirmed by the district court. The Department of Health has appealed to this court.

This court's review of an administrative agency's decision is de novo on the record. Neb. Rev. Stat. § 84-918 (Reissue 1981); *Haeffner v. State*, 220 Neb. 560, 371 N.W.2d 658 (1985); *Department of Health v. Grand Island Health Care*, 223 Neb. 587, 391 N.W.2d 582 (1986). This does not mean that we ignore the findings of fact made by the board and the fact that it saw and heard the witnesses who appeared before the board at its hearing.

At the time of the hearing there were two hospitals in health planning subarea III which were equipped to furnish radiation therapy. Good Samaritan Hospital in Kearney, Nebraska, had a Linac 6 unit and The Mary Lanning Memorial Hospital in Hastings, Nebraska, had a Cobalt-60 unit. The Mary Lanning hospital had obtained a certificate of need for a 12-MeV (megaelectron volt) unit, which was expected to be operational in 1985.

The project proposed by the applicant was the acquisition of a 6-MeV medical linear accelerator, with the intent to expand the hospital's present abilities to treat oncology patients. Locally, the linear accelerator would be shared with St. Francis Medical Center and the Veterans Administration Medical Center, in addition to providing service for patients who travel to Grand Island from outlying communities.

In addition to purchasing the linear accelerator, a 3,700- to 4,000-square-foot building was to be constructed to accommodate the radiation equipment and to provide three examination rooms, office space, and a waiting room. The estimated cost of the entire project was $885,191; the equipment and furnishings to total $413,075, while construction of the therapy center (including architectural and engineering fees) was estimated at $472,116. Financing for the equipment was to be through Nebraska financing authority at .08875 percent interest. Construction costs were to be financed with $300,000 of donated funds; the remaining balance of $172,116 was to be commercially financed at an estimated 13.5-percent interest.

The useful life of the linear accelerator would be about 7 to 10 years. The annual anticipated total cost of operation was estimated to be $217,000. From this data, it was calculated that the break-even point for operating costs would be 163 patients or 4,075 treatments per year. The approximate cost per treatment to the patient for the first year of operation was estimated to be $65, which was comparable to existing services.

The administrator of the applicant, Ken Klaasmeyer, testified that during 1983 the applicant operated at a loss but that in 1984 the applicant realized a net growth or profit of $330,000. In terms of actual occupancy rates, Klaasmeyer stated that of the 128 beds within the hospital, approximately 60 percent of the 108 medical-surgical beds were occupied in 1983.

Neb. Rev. Stat. § 71-5830(6) (Reissue 1986) requires that a certificate of need be obtained prior to "[a]ny capital expenditure or obligation incurred by or on behalf of a health care facility in excess of the capital expenditure minimum made . . . [f]or the purchase . . . of clinical equipment . . . ." Minimum capital expenditure is defined in Neb. Rev. Stat. § 71-5805.01 (Reissue 1986) as a "base amount of five hundred thousand dollars . . . ." Because the cost of the proposed project was anticipated to exceed $500,000, a certificate of need was required.

The Nebraska Legislature has declared the purpose of the certificate of need act:

[T]o conserve the limited health care resources of

personnel and facilities in order to provide quality health care to all citizens of the state, to minimize unnecessary duplication of facilities and services, to encourage development of appropriate alternative methods of delivering health care, to promote wherever appropriate a more competitive health care delivery system, to encourage the provision of high-quality health care which is available and accessible to all citizens of the state, and to maximize the effectiveness of expenditures made for health care.

Neb. Rev. Stat. § 71-5802 (Reissue 1986).

Whether the applicant should receive a certificate of need is to be determined from the provisions of the Nebraska Health Care Certificate of Need Act encompassed in Neb. Rev. Stat. §§ 71-5852 to 71-5855 (Reissue 1986); the Department of Health regulations (promulgated under the certificate of need act), Neb. Admin. Code tit. 182, ch. 2, §§ 005-006 (1983); and the Nebraska State Health Plan 1982-1987 (Neb. Dept. of Health 1982). *Department of Health v. Grand Island Health Care*, 223 Neb. 587, 391 N.W.2d 582 (1986).

The statutes require the Nebraska Department of Health to promulgate criteria by which to assess applications for certificates of need. According to the rules adopted by the Department of Health, the applicant "bears the burden of demonstrating in its application that the proposal satisfies all of the review criteria" applicable to the proposal at hand. Neb. Admin. Code, *supra*, § 003.02C. However, in an appeal from a decision granting a certificate of need, the party appealing bears the burden of proof that the application does not meet the applicable criteria. Neb. Rev. Stat. § 71-5865 (Reissue 1986).

The decision of an appeal board of the Nebraska Certificate of Need Appeal Panel is the final determination of the health department. Neb. Rev. Stat. § 71-5866 (Reissue 1986). There is no presumption of error, and, as in any usual appellate situation, the party alleging error has the burden of proof to establish error.

The controversy in this case centers around the following provisions of the certificate of need regulations (Neb. Admin. Code tit. 182, ch. 2 (1983)) adopted by the state Department of

Health:
>006.07 Therapeutic Radiology.
>>006.07A A megavoltage radiation therapy unit shall treat at least 300 new cancer cases annually within three years after initiation.
>>006.07B There shall be no additional megavoltage units opened unless all existing megavoltage units in the health planning subarea are performing at least 6,000 treatments per year, and such new units will decrease access time to care. Adjustments downward may be justified when travel time to available services exceeds one hour for 50 percent of the population in health planning subareas I through IV (as shown on Attachment 1 [map of Nebraska subareas]), or one hour for 10 percent of the population in the Southeast and Midlands subareas (as shown on Attachment 1).

In addition to the regulations of the Department of Health, the Nebraska state health plan sets forth goals and objectives in reference to therapeutic radiology. Those relevant in this case are:
>5.3.7.3 Goals and Objectives
>>GOAL 1 Access to megavolt radiation therapy units should be increased.
>>GOAL 2 There should be no additional megavoltage units opened unless (1) access to care is increased, and (2) all existing megavoltage units in the health service area(s) are performing an average of at least 6,000 treatments per year.
>>OBJECTIVE 2(A) By 1985, hospitals with single units failing to meet established goal levels in the Midlands should consider phasing out this service.
>>GOAL 3 Adjustments downward in economic utilization rates (6,000 per year) may be justified when travel time to an alternate unit exceeds: (a) one hour for 50 percent of the population in Greater Nebraska, (b) one hour for 90 percent of the population in Southeast Nebraska and the Midlands.

Nebraska State Health Plan 1982-1987, *supra* at V-242.

The appeal board found there is a need for radiation therapy

services in the service area; that the area to be served by the proposed project has been defined; that a linear accelerator to be located in Grand Island Memorial Hospital in Grand Island, Nebraska, for a cost of $885,000, is the least costly alternative for providing such service or, if not the least costly, is the most effective alternative; that the increase in costs or charges resulting from the project is justified by the need and that the project is financially feasible for the life of the linear accelerator; that the proposed project coordinates with the existing health care system and that the need established is consistent with the need projections in Neb. Admin. Code, *supra*, § 006, and with the state health plan; that even if the need established is inconsistent with the need projections in Neb. Admin. Code, *supra*, § 006, and with the state health plan, exceptions to the state health plan and Neb. Admin. Code, *supra*, § 006, shall be made when justification is shown by a preponderance of the evidence and the preponderance of the evidence herein justifies such exception; and that the applicant has carried its burden of proving that the project meets all the applicable criteria.

The primary contention of the Department of Health is that the evidence is insufficient to support the appeal board's determination that all applicable review criteria have been met. In support of its position, the department asserts that the proposed unit would not treat 300 new cancer cases annually within 3 years of its initiation unless it drew patients from existing units.

Charles Myers, the assistant administrator of the applicant, testified as a witness for the applicant. Myers introduced a map which represented the combined service area of Grand Island, Hastings, and Kearney. The map reflected the number of patients from each Nebraska county who were treated in Hastings, Kearney, or either St. Francis or the applicant in 1983. According to Myers, this information was obtained by an analysis of patient origin information reported to the state.

Myers then testified as to the 1985 population for each county in the combined service area based on estimates by the bureau of business research of the University of Nebraska. The total population of the combined service area was stated to be

393,409. Myers then referred to the state health plan published in 1982, which he testified states that for every 1,000 people, 3.7 new cancers are expected to develop annually. By multiplying the population of the service area by the risk factor, Myers concluded that there would be 1,456 new cancer cases per year in the combined service area.

According to the state health plan about 60 percent of all new cancer cases will be treated with radiation therapy, and the average number of treatments per patient is 25. Thus, Myers concluded there would be approximately 21,850 total treatments each year in the combined service area.

Similarly, Myers conducted a statistical analysis of the Grand Island service area (not the combined service area) and concluded that the number of treatments per year in the Grand Island service area would be 7,550.

Based on the above data, Myers concluded there would be 504 new cancer cases in the Grand Island service area annually, thus meeting the 300-case requirement of the Nebraska Administrative Code. Additionally, Myers concluded that the projected 7,550 treatments per year exceeded the 6,000-per-year requirements of both the Nebraska Administrative Code and the state health plan.

In its brief, the Department of Health criticizes the statistics relied on by the applicant. The department asserts that despite the applicant's showing of 504 new cancer cases annually for the Grand Island service area, and thus approximately 302 cases requiring radiation, Grand Island cannot assume that all 302 patients would choose to undergo the treatment and, even if they did, that they would choose the Grand Island hospital. There is evidence tending to show that, traveltime aside, many patients opt not to undergo radiation therapy because less than one-half obtain curative results, because of the associated physical discomforts, and finally, because of the trend toward dying at home and refusal of life-prolonging treatment.

In regard to the impact of the proposed Grand Island unit on already existing units in the subarea, Myers stated:

> Well, I think that just looking at the figures, there's going to be an impact. At the same time, I don't think the impact is . . . nearly as severe as one would have you believe.

These three communities serve, for the most part, distinct populations. They are the three largest cities in central Nebraska. They're going to have their people in their counties and their service area that are going to continue to use these services. I think the impact is not that great.

I guess another point that needs to be brought up is that the Hastings unit that has been proposed or that is anticipated to come on line in November of '85 is an MEV 12. An MEV 12 is capable of treating a percentage, and the percentage that I've been told from the American College of Radiology is between 5 to 10 percent of those patients that can't be treated with a 6. I hesitate to get too much in detail, but I think it has to do with very deep-seated tumors. It also has to do with perhaps breast — some breast malignancies.

So while we are going to have an impact, we are also going to be providing referrals back down there, or at least Hastings would be the nearest available unit that could take care of those particular cases.

Dr. Hrnicek, an internist in Grand Island whose practice relates extensively to cancer, stated that the impact on existing radiation units in Hastings and Kearney would be "minimal." As a basis for his opinion, Dr. Hrnicek stated that the distance from the Grand Island service area to Kearney is so great that he has only referred one patient to Kearney in 4 years. Dr. Hrnicek did state that of the patients he refers for radiation therapy, approximately one-half go to Hastings and one-half to Omaha, with a few going to Lincoln.

Dr. VanWie, a general surgeon in Grand Island, maintains a practice, 30 to 40 percent of which is devoted to cancer-related surgery. Like Dr. Hrnicek, Dr. VanWie stated that a radiation unit in Grand Island would not have a substantial impact on the unit in Kearney because he has not sent any patients to the Kearney unit. Dr. VanWie also sees the impact on Hastings as declining because he has begun referring more patients to Lincoln.

Based on this testimony, it appears that significant numbers of patients would not be drawn from Hastings or Kearney.

Instead, patients may be drawn from the Lincoln and Omaha areas, where the impact would be less severe because two-thirds of all units in those cities operate at a level over 6,000 treatments and could thus sustain a loss in number of treatments without a significant impact.

Despite the fact that the applicant has shown that the proposed equipment and facility at Grand Island would realistically treat the required number of patients, the Department of Health asserts that the applicant must also show that "all existing megavoltage units in the health planning subarea are performing at least 6,000 *treatments* per year" before a new unit may be "*opened*." (Emphasis supplied.) Neb. Admin. Code tit. 182, ch. 2, § 006.07B (1983).

The applicant argues that there are two discrepancies in the above regulation, both of which support a decision in its favor. First, because the term "treatment" as used in the regulations, the statutes, and the state health plan is not a defined term, it is vague and ambiguous. The applicant then asserts that because the regulation contains an ambiguous term it is arbitrary and capricious and imposes an impossible requirement on applicants attempting to satisfy that particular criterion. Because of the regulation's use of an undefined term, the applicant asks that an exception to the regulation be granted.

The record does contain evidence which establishes the fact that the term "treatment" as used in Neb. Admin. Code, *supra*, § 006.07B, has been interpreted to have different meanings by Good Samaritan Hospital and The Mary Lanning Memorial Hospital. Defendant's exhibit 13 (contained in exhibit 1 of the district court's proceedings) is a letter from the president of Good Samaritan sent to the Department of Health in response to the department's request for information. An attachment to the letter indicates that at Good Samaritan "a patient is counted each time they receive a treatment whether they receive one field or ten fields." Similarly, in response to the department's request for information from Mary Lanning, the administrator for Mary Lanning hospital stated, "Our practice is to classify as a treatment in radiation therapy each area that radiation is exposed to during the visit of a patient."

The statutes and the regulations in the Nebraska

Administrative Code do not define the word "treatment." However, the state health plan uses the word "treatments," directly followed by the word "visits" in parentheses. Nebraska State Health Plan 1982-1987, V-236 (Neb. Dept. of Health 1982). Because an application for a certificate of need is governed in part by the state health plan, *Department of Health v. Grand Island Health Care*, 223 Neb. 587, 391 N.W.2d 582 (1986), the definition provided by the plan is applicable. Since the state health plan was promulgated by the Nebraska Department of Health, the rule that a state agency's interpretation of its own regulation should be given significant weight and that the interpretation should be given great deference is applicable. *Smith v. Sorensen*, 748 F.2d 427 (8th Cir. 1984); *Columbus Community Hospital, Inc. v. Califano*, 614 F.2d 181 (8th Cir. 1980).

Since "visit" is equivalent to "treatment," the statistics reported by Mary Lanning create doubt as to whether Mary Lanning is exceeding 6,000 treatments per year. The number is unknown, because there is no evidence as to the average number of "fields" irradiated per patient visit.

The evidence indicates that up to 1985, the linear accelerator in Kearney, operational since September 1982, had not performed 6,000 treatments in any year. In 1983, the first full year of operation, 3,505 treatments were performed; 4,858 in 1984; and 1,255 for the first quarter of 1985. However, it is significant that the number of treatments has increased steadily and probably exceeded 5,000 in 1985. Section 006.07B of the regulation states that no new radiation therapy unit shall be *opened* unless all others in the subarea are performing at least 6,000 treatments per year. Neb. Admin. Code tit. 182, ch. 2, § 006.07B (1983). The applicant contends that the use of the term "opened" allows it to consider the projected number of treatments that Kearney will be performing at the time the Grand Island unit is ready to be placed in service. In other words, the use being made of other units is to be determined as of the time of completion of the project.

The regulation permits adjustments downward when traveltime to available services exceeds 1 hour for 50 percent of the population in the subarea. Plaintiff's exhibit 8 is a chart

showing the travel distance for patients living in the Grand Island service area. Plaintiff's exhibit 7 is a chart showing a comparison of the miles traveled to the closest existing unit and the miles that would be traveled if a unit were available in Grand Island. The exhibits show that at this time approximately 42 percent of patients living in the Grand Island service area must travel for more than 1 hour to obtain radiation therapy. Neither chart satisfies the requirement stated in the regulation, but they tend to support the board's finding that exceptions are justified in this case.

The applicant asserts an additional ground for an exception under §§ 005.01A and 005.01B of the regulations:

005.01A. The applicant must establish that there is an unmet need for health care services for a specific population.

005.01A1 A need exists when additional services for health care are essential to make high-quality health care available and accessible to all citizens of the state.

005.01A2 Under this part 005.01A, the population in need and the health care services which are needed must be identified, and the need of that population for the identified services must be established. The need which must be established under this part 005.01A is the need for diagnostic, treatment, rehabilitation, or maintenance services, not facilities or equipment. Facilities or equipment for providing the needed services must be identified under subsection 005.02 below. . . .

. . . .

005.01B The need established under part 005.01A above must be consistent with the need projections in section 006 of these regulations (182 NAC 2), and with those in the state health plan most recently adopted under section 1524(c)(2)(A) of P.L. 93-641, 42 U.S.C. 300m-3(c)(A), and on file with the Secretary of State, each of which is hereinafter referred to as a document. Projections in section 006 of these regulations shall take priority over those in the state health plan in the case of conflicts between those documents. *Exceptions to the requirement of consistency with the projections in the*

> *document having priority shall be made when justification is shown by a preponderance of the evidence.*

(Emphasis in § 005.01B supplied.) Neb. Admin. Code, *supra*, §§ 005.01A and 005.01B.

Apparently, the provision for exceptions when justification is shown by a preponderance of the evidence has its origin in § 71-5852, as amended in 1982, which provides in part:

> The department shall, by rules and regulations, provide criteria for:
>
> (1) The relationship of the health services being reviewed to the state health plan adopted under section 1524(c)(2)(A) of P.L. 93-641, 42 U.S.C., section 300m-3(c)(2)(A) and to the state medical facilities plan, adopted under section 1603 of P.L. 93-641, 42 U.S.C., section 300o-2, as amended by P.L. 96-79, *but exceptions to the state health plan shall be made when justification is shown by a preponderance of the evidence.*

(Emphasis supplied.)

The provisions for exceptions contained in both the regulations and the statute permit the board to grant a certificate of need when there is an unmet need for health care services for a specific population, even though there is not full compliance with the requirements of Neb. Admin. Code, *supra*, § 006.

The issue of an unmet need for health care services for a specific population was addressed in the testimony of medical personnel from Grand Island. Dr. Rusthoven, a diagnostic radiologist, testified that there was no linear accelerator in the Grand Island service area and that if one were installed, patients from the Grand Island area would use the facility. Dr. Rusthoven stated that Grand Island hospitals can currently treat cancer patients with surgery and chemotherapy, but then "lose them because we have to let them go somewhere else for radiation therapy." Dr. Rusthoven stated that not only is the situation frustrating to physicians, but it also presents a serious problem to the patients involved. Such a situation, according to Dr. Rusthoven, results in a fragmentation of care, where the patient experiences a loss in continuity as the patient travels from doctor to doctor and hospital to hospital. Additionally,

the patient may encounter increased medical expenses because of duplicative testing as well as a decrease in the effectiveness of treatment when travel is impossible due to weather conditions or the physical status of a patient.

Dr. VanWie specified economic reasons as the basis of need for a linear accelerator in Grand Island, as well as his belief that a linear accelerator in Grand Island would improve the quality of care. Dr. VanWie recounted instances where patients have refused radiation treatments because of the traveltime involved.

Dr. Hrnicek stated that about one-half of his practice deals with cancer, and it is his opinion that a linear accelerator is necessary in Grand Island because of the difficulty involved in traveling. He, too, related incidents where patients refused radiation therapy because of the expense and the physical discomforts associated with travel for treatments. He testified that if a unit were in Grand Island, the majority would accept treatment.

Joan Muhvic, hospice coordinator and oncology nurse at the applicant, supported the hospital's application for a linear accelerator. Muhvic stated that "we have a large drawing range for the patients who come to Grand Island, and presently for those patients to continue, it's impossible for them to continue with their present physician because they're being shipped out of the treatment area for their radiation therapy." She went on to state: "Radiation therapy is a very standard form of treatment for cancer, and I think that the patient has the right to be able to expect that with their private physician in their own locality."

Muhvic stated that communications between doctor and patient break down when the patient travels to a new facility for treatment. She also stated that during the course of therapy, patients become weak and tired and may experience nausea and vomiting. She, too, has experienced patients who have looked at various locations for treatments in an attempt to minimize traveltime.

Finally, Myers, the assistant administrator of the applicant, stated that Grand Island needed its own unit rather than relying on Hastings and Kearney because: "We are attempting to

become a comprehensive cancer center to be able to provide those three modalities of care. We have the two modalities. We have the support services set up. This is the last modality which we need to take care of those cancer patients."

There is additional evidence which supports a finding that exceptions are justified in this case.

The record shows that cancer is the second leading cause of death. It is primarily a disease of the elderly, and the Grand Island area has a higher percentage of elderly persons as residents than other areas. Not only is the number of elderly persons increasing as a proportion of the population, but the rate of cancer has increased from 3.7 new cases per 1,000 population per year (which was the basis for the calculations made in the application) to 4 new cases per 1,000 population per year.

From our review of the record, we find that the appellant has not carried its burden of proof and that the judgment of the district court should be affirmed.

AFFIRMED.

CAPORALE, J., dissenting.

In my view the majority has reached a result which is legally incorrect, and I therefore respectfully dissent.

Grand Island is in Nebraska Department of Health planning subarea III, which consists of 21 counties in the south-central part of the state. The area includes Adams County, in which the city of Hastings is situated; Buffalo County, in which the city of Kearney is placed; and Hall County, in which the city of Grand Island is located.

At the time of the hearing before the Nebraska Certificate of Need Appeal Panel, radiation therapy was available within subarea III at two places: Kearney, at a site 43 miles from the proposed location of the linear accelerator for which applicant seeks approval, and Hastings, at a point only 26 miles from the applicant's proposed facility.

Although the linear accelerator at Kearney has been in place since September of 1982, it was not delivering 6,000 treatments per year at the time of the appeal panel hearing. Moreover, the evidence fails to establish that the cobalt unit in Hastings was then delivering 6,000 treatments per year. While the evidence

suggests that the applications of cobalt and linear acceleration therapies differ, the evidence is that an application for the installation of a linear accelerator at Hastings had already been approved. There is no evidence that such approval has been withdrawn or that installation of the approved unit has been abandoned.

Pitted against that history is the applicant's prophecy, through its assistant administrator, that its additional accelerator will deliver 7,550 cancer treatments per year. That prediction is based on the assistant administrator's assumption that the applicant will entice cancer patients in varying percentages from 17 counties, only 9 of which are in subarea III. This witness himself concedes that his assumption concerning the applicant's market shares from those 17 counties is but a "gut reaction," that is to say, a guess without any statistical foundation whatsoever—speculation, pure and simple. Not only does the evidence reveal no basis for the number of patients the applicant assumes it will capture, the assumption completely ignores the fact that a linear accelerator has been approved for positioning at Hastings. For those two reasons alone, there is no more relationship between the applicant's presaging of 7,550 treatments per year and reality than there is between reality and a tale by the Brothers Grimm.

The true basis for the applicant's effort is best revealed, perhaps unconsciously, by the local medical practitioner's lament that the Grand Island hospitals lose patients "because we have to let them go somewhere else for radiation therapy." While such a parochial concern is understandable, it has no legal significance. See *Beatrice Manor v. Department of Health*, 219 Neb. 141, 362 N.W.2d 45 (1985), which holds that merely demonstrating a local demand for a nursing home does not establish a need for one. In so holding, we observed that while demand connotes an immediate preference to live in a particular nursing facility, need focuses on long-range plans to provide required services to an entire population.

The Legislature in its wisdom has enacted legislation designed to eliminate unnecessary duplication of certain medical facilities in an effort to reduce the overall cost of health care for the citizens of the state. This court is obligated to

adhere to that legislatively declared policy.

For the foregoing reasons, I would reverse the decision of the district court affirming the appeal panel and reinstate the decision of the Certificate of Need Review Committee denying the application.

SHANAHAN and GRANT, JJ., join in this dissent.