**HERITAGE OF YANKTON, INC., d/b/a Yankton Care Center, a South Dakota Corporation, Plaintiff and Appellant,**

v.

**SOUTH DAKOTA DEPARTMENT OF HEALTH; Lawrence J. Massa, Department Secretary, Defendants and Appellees.**

No. 15992.

Supreme Court of South Dakota.

Considered on Briefs Aug. 29, 1988.

Decided Nov. 23, 1988.

Robert L. Lepp of McGill, Koley, Parsonage & Lanphier, P.C., Omaha, Neb., and Craig A. Kennedy of Doyle and Kennedy, Yankton, for plaintiff and appellant.

Mark A. Moreno, Sp. Asst. Atty. Gen., Pierre, for defendants and appellees.

SABERS, Justice.

Heritage of Yankton (Heritage) appeals a circuit court order affirming the South Dakota Department of Health's (Department) denial of an application for a certificate of need (CON).

*Facts*

Heritage filed a CON application with the Department on October 31, 1984, to construct an addition for thirty intermediate care beds and renovate its existing nursing home facility in Yankton, South Dakota. Following a public hearing held December 12, 1984, Department's staff recommended denial of the application. Heritage subsequently submitted additional information, but on March 13, 1985, Department denied the application.

Heritage filed a request for reconsideration pursuant to ARSD 44:01:14:01. The Department approved the request and held a second public hearing on May 14, 1985. At the hearing, Heritage presented additional information in support of its CON application. On June 12, 1985, the Department denied the application again. The circuit court affirmed the Department's decision on September 21, 1987.

1. *Whether finding of no bed need was clearly erroneous.*

The Department denied Heritage's CON application based on its determination that there was a lack of need for additional beds. Heritage contends that this finding was clearly erroneous. This issue is factual in nature, and should be given deference

by this court under the clearly erroneous standard. *Permann v. South Dakota Dept. of Labor*, 411 N.W.2d 113 (S.D.1987). The Department's role as a fact finder, as well as its expertise in the subject matter, places it in a better position than this court to determine the merits of the CON application. Thus, we should not reverse the decision of the Department unless we are left with a definite and firm conviction that a mistake has been made in light of the entire record. *Id.*

The South Dakota CON law is set out in SDCL chapter 34-7A and implemented through ARSD 44:01. Further guidance is provided to the Department by the State Medical Facilities Plan (MFP).[1] The Department relied upon the bed need limitations set out in ARSD 44:01:09:07 and the MFP. These provisions limit the number of long-term nursing beds according to age and population of the area served by the facility.[2] These provisions also make a distinction between urban and rural areas.[3] Based on these computations, the Department determined that a surplus of beds existed in the Heritage service area, that a surplus would continue, and that the proposed addition would add to this surplus. The Department also noted that a surplus of beds would exist if the determination were based solely on the population of the city of Yankton, rather than the population of the facility's service area. The Department did determine that a significant bed shortage would exist if the determination were based solely on the population of Yankton County.[4]

Despite this latter determination, the Department asserted that county borders were an improper measure of bed need. The Department held that the Heritage service area was the true indicator of bed need and justified rejection of the CON application. The Department also found that Heritage's application failed to suggest other alternatives to institutionalization as required by ARSD 44:01:10:15. The Department did not find any problems with the actual project, acknowledging that the proposal was well planned and financed. The Department also noted that the proposal would improve the overall care and service of Heritage's facility.

At the reconsideration hearing, Heritage submitted three additional items for the Department's consideration. First, Heritage submitted data which projected a population increase in Yankton County, in contrast to the projections relied upon by the Department. Second, Heritage produced statistics on in-migration and out-migration of patients between Nebraska and South Dakota. This data showed that twenty Heritage beds were occupied by Nebraska residents, while very few South Dakota residents out-migrated to Nebraska. Third, Heritage submitted that alternatives, such as home health care, had been developed and used in the Yankton area for more than seventeen years, but did not eliminate the need for additional beds.

On reconsideration, the Department affirmed its decision, again relying upon the lack of need for additional beds. The De-

---

1. The MFP is referred to in ARSD 44:01:06:01(15). It is prepared by the State Health Planning and Development Agency as the basis for assistance under Title XVI of the Public Health Service Act.

2. The "relevance index method" is used to determine the population of the area served by a facility. This method involves a computation of the percentage of patients drawn from the total population of each county from which the facility in question draws its patients.

3. The guidelines provide that there is less need for beds in urban areas than in rural areas. The rationale for this distinction is that more alternative forms of elderly care are available or should be made available in urban areas.

Heritage challenges the Department's use of different figures for rural and urban areas, since ARSD 44:01:09:07 did not provide for such a distinction at the time of the Department's decisions. However, the Department could have relied upon the rural and urban distinctions provided for in the 1984 MFP.

4. In contrast to this determination, the Department later determined in May findings of fact and conclusions of law, that a bed shortage did not exist in Yankton County. This determination was made by including in its calculations 50% of the beds from two rest homes just outside the borders of Yankton County.

partment rejected the population figures submitted by Heritage stating that it used standard figures in each CON decision which could not be varied. Further, the Department considered the in-migration and out-migration between Nebraska and South Dakota in determining the service area of Heritage.

Heritage cites *Department of Health v. Grand Island Health Care, Inc.*, 223 Neb. 587, 391 N.W.2d 582 (1986), to support its contention that the Department's decision was clearly erroneous. The factual situations are similar with respect to the determinations that surplus beds existed in the service area of the facility, while a shortage existed in the actual county of the facility. The *Grand Island* court rejected the Nebraska Department of Health's argument that beds from other counties could be used to meet this shortage. The court also considered the occupancy rates and vacancies of the various rest homes in the area and determined there was a high demand for additional beds. The *Grand Island* court rejected the department's calculations for need based on an exception under the Nebraska law where special circumstances exist. The court found by a preponderance of the evidence that these special circumstances existed and did not rely upon the department's calculations. A similar exception to the calculations for bed need exists under South Dakota law in ARSD 44:01:09:07 which provides, "An exception may be made if a project is to serve a special population or if special problems of access or availability exist."

In *Grand Island*, the court reviewed the entire decision de novo, including the availability of the exception. In contrast, this court is limited by the clearly erroneous standard of review for the Department's factual findings. *Permann, supra.* The availability of the exception, though a mixed question of law and fact, is "essentially factual" and must be reviewed under the clearly erroneous standard. *Id., supra* at 119. The Department found that the Heritage service area did not present spe-cial circumstances warranting the exception. We are not left with a definite and firm conviction that a mistake was made by the Department in determining that the exception was inapplicable. Thus, unlike *Grand Island*, the Department could properly rely upon the bed need calculations.

The bed need formula, relied upon by the Department, showed a lack of need for additional beds in the service area. However, the question remains whether there is sufficient other evidence to make the Department's finding of lack of need clearly erroneous. Heritage contends that the actual demand for additional beds is high.[5] Further, Heritage argues that the need for additional beds is shown by the Department's own figures, which indicate a bed shortage in Yankton County. Finally, Heritage questions the validity of the formula used to determine need.

The Department considered current demand for additional beds in the area. The Department found a sufficient number of area vacancies to satisfy this demand. Further, the Department claims its calculations show need over the long run, which it claims is a better and more reliable indicator than current demand statistics.

The Department also rejected the bed shortage in Yankton County to show need. The Department argues it has never considered county boundaries in determining bed need, and that the population of the facility's service area is the proper area for consideration. In view of its policy to maintain high occupancy rates in all facilities, the Department also rejected Heritage's claim that the Department's formula forces the elderly to be separated from their families and home communities.

The Department's bed need formulas have previously been used to determine bed need. *Nehlich v. South Dakota Comprehensive Health*, 290 N.W.2d 477 (S.D.1980). These formulas are not subject to easy manipulation as they are based on statistics of a facility's occupancy over several years.

---

5. This evidence was based on the occupancy rates, vacancies, and waiting lists of rest homes in the area. These statistics indicated high oc-cupancy rates and low vacancy rates in all of the area facilities.

Further, Heritage has not presented authority to seriously question the validity of these calculations.

Unlike the court in *Grand Island*, we are not permitted to make independent findings of fact without reference to the Department's findings. *Grand Island, supra* 391 N.W.2d at 584. Under this limitation and in view of all the above, we cannot say the Department's determination of a lack of bed need was clearly erroneous. *Permann, supra.*

2. *Whether the Department's decision was arbitrary and capricious.*

■ Heritage contends that Department's actions were "Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion," under SDCL 1-26-36, because its decision was based solely upon the formulas for determining need and not upon any of the evidence submitted by Heritage, or the other evidence in the record. SDCL 34-7A-38 provides, "the department of health shall consider at least the following items when reviewing an application" for a CON. Generally, these factors include need, conformance with health plans, cost, availability of alternative services, impact on affected persons and services, possible economies and improvement of service (if joint), financing, financial resources, the time required to implement the plan, effect on other area health services, availability of personnel, management capabilities, and special circumstances, if any. These factors are similar to those in ARSD 44:01:10. It is evident that the Department must consider all these factors.

Heritage relies on *Oak Park Manor v. State Certificate of Need Review Bd.*, 27 Ohio App.3d 216, 500 N.E.2d 895 (1985). The court in *Oak Park* found that the administrative review board placed too much emphasis on the formula for calculating need. The court noted that under Ohio law, the formula is to be used as a guideline and not as a determinative factor in the CON process. The *Oak Park* court stated that:

Although the consultant found in favor of appellant on many factors, albeit vaguely at times, the report clearly suggests that the formula, indicating a surplus of beds, was the primary and overriding factor. Thus, the consultant balanced each and every other factor against the sole criterion of an excess in beds, rather than balancing all the factors.

*Id.* 500 N.E.2d at 898.

ARSD 44:01:10:01 provides that "Failure to comply with one or more [of the considerations in ARSD 44:01:10] is grounds for rejection of the application" for a CON. One of these considerations is bed need. Thus, unlike the situation in *Oak Park*, under South Dakota CON law, bed need may be a determinative factor and it may be proper for the Department to balance it against the other factors. This would not eliminate the obligation of the Department to consider all the factors.

Heritage claims the Department acted arbitrarily by solely relying on the bed need formulas and failing to consider other evidence of bed need. The administrative rules require the Department's use of the bed need formulas to determine actual need. However, the Department must consider other evidence of bed need. Finding of Fact IV of the Department decision sets out the occupancy and vacancy rates of area nursing homes over a three year period. Further, Finding of Fact V states that bed need formulas indicate a need for additional beds in Yankton County, but that the service area indicates a surplus of beds, indicating that area "facilities ... have been meeting the needs of Yankton County residents." These findings indicate that the Department did consider the evidence of high demand and shortage of beds in Yankton County in addition to the bed need formulas. The arbitrary and capricious standard of review:

[C]onveys the sense that the decision is totally intolerable; it rejects only those decisions which are outside any conceivable rational alternative. ... Arbitrariness allows a decision to pass despite a much lower probability that the administrative judgment is correct than either

reasonableness or agreement review....[6]

Evidence that the agency might have ignored facts, or had not made a good faith effort to gather or consider significant information, may lead to a finding of arbitrariness.

C. Koch, *Administrative Law and Practice* § 9.6 at 100–01 (1985). We cannot say the Department acted arbitrarily and capriciously in its decision.

### 3. *Failure to consider new evidence at the reconsideration hearing.*

■ ARSD 44:01:14 deals with the Department's reconsideration of applications for a CON. ARSD 44:01:14:01 states that the Department *may* hold a hearing to reconsider a decision upon a showing of good cause. In this case, the rehearing was granted to consider additional information by Heritage. Heritage contends that the Department failed to consider the additional material submitted at the rehearing, which, if true, would violate SDCL 1–26–36.

Heritage equates consideration of the additional items with acceptance. While the Department refused to accept the new information, there is no indication that it did not consider the information. The Department provided valid reasons for rejecting the new information, including the fact that it had already considered some of it. In light of the record, the Department did not act arbitrary and capricious, nor abuse its discretion under SDCL 1–26–36.

AFFIRMED.

WUEST, C.J., and MORGAN, J., concur.

MILLER, J., concurs in result.

HENDERSON, J., dissents.

MILLER, Justice (concurring in result).

For all of the reasons articulated by Justice Henderson, the trial court's and Department's decisions could be reversed.

However, because this case has languished so long in "the system," Heritage will probably be better off by starting all over again. Since the 1988 Legislature, by S.L. Chapter 277, repealed the certificate of need provisions, it would seem consideration of Heritage's expansion plans would now be less complicated and time consuming.

A chronology demonstrates that this case has been unforgivably protracted: *

| | |
|---|---|
| October 31, 1984— | Heritage filed its application for a certificate of need with Department. |
| December 12, 1984— | A public hearing was held on the application. |
| March 13, 1985— | Department denied application. |
| April 11, 1985— | Heritage filed a request for reconsideration with Department. |
| May 14, 1985— | A second public hearing was held. |
| June 12, 1985— | Department again denied the application. |
| July 1, 1985— | Heritage filed a notice of appeal in circuit court. |
| August 5, 1985— | Counsel entered into a stipulation regarding the record. |
| October 16, 1986— | Counsel entered into another stipulation regarding the record. |
| November 5, 1986— | Heritage filed its brief with the circuit court. |
| Date Unknown— | Department's brief was filed with the circuit court. |
| August 4, 1987— | Trial court issued its memorandum decision. |
| September 8, 1987— | Trial court issued an addendum to its memorandum decision. |
| September 21, 1987— | Trial court judgment was entered affirming Department. |
| October 22, 1987— | Notice of appeal was filed with the Supreme Court. |
| February 3, 1988— | Heritage filed its brief with this Court. |
| April 6, 1988— | Department filed its brief with this Court. |
| April 25, 1988— | Heritage filed its reply brief with this Court. |
| August 29, 1988— | Case was considered on briefs by this Court. |

Four years have transpired in this proceeding. All litigants in this state are entitled to a prompt adjudication of their claims. The "system" malfunctioned here. From the foregoing chronology, it is impossible to point the finger and attach complete fault to any individual. One must ponder, however, why Heritage's trial brief was not submitted until fifteen months af-

---

**6.** Reasonableness review is defined in *Koch* as substantial evidence review and agreement review is defined as de novo or substitution of judgment review. *See Koch, supra* §§ 9.3, 9.4.

* Every time I look at it, I am reminded of the "I'm Mad Too, Eddie" bumper stickers. Undue court proceeding delays make me as angry as government spending angers Eddie Childs.

ter the first stipulation regarding the record, or, why the trial court's memorandum decision was not handed down until nine months after that.

In any event, it is clear that the evidence is now stale. (For example, much of the evidence centered around population projections for the years 1984 and 1986, projections of bed shortages for 1985, occupancy rates for November 12, 1984, waiting lists for February 21, 1985, vacancy lists for May 21, 1985, and the 1983 Health and Human Services study on Medicaid and nursing home care.) Although a reversal would be a "moral victory" for Heritage, the victory would be most shallow. However, as stated earlier, Heritage is probably placed in a better posture through the affirmance. Now it has the opportunity to begin anew under the new law, using current statistical data and updated information. It is further given the opportunity to reevaluate its own projected plans. One must hope (and assume) that new proceedings will receive the appropriate, prompt attention deserved.

HENDERSON, Justice (dissenting).

Respectfully do I dissent herein and base my dissent, in my own jargon, as follows: The Department of Health made its decision upon methodology rather than upon reality. An elaboration follows, but I wish to strike the scope of review chord at this time, also.

Yankton Care Center, appellant, maintains: (1) The Department's decisions of March 13 and June 12, 1985, were clearly erroneous in light of the entire evidence in the record; (2) the Department's decisions were arbitrary, capricious, and characterized by an abuse of discretion because Department relied *solely* on "its own" bed need formulas and refused to consider additional evidence of need and updated population projections at a reconsideration hearing; (3) Department's June 12, 1985 decision was made upon unlawful procedure and affected by error of law because Department refused to consider updated populations at a reconsideration hearing. Scanning these three items of advocacy, it be-

comes apparent that the first item is a fact question and is subject to the clearly erroneous standard of review. As pertains to the other two claims of error, these are essentially questions of law and are reviewable by this Court de novo. *In re Townley,* 417 N.W.2d 398 (S.D.1987); *Permann v. Department of Labor,* 411 N.W.2d 113 (S.D.1987); *In re Guardianship of Viereck,* 411 N.W.2d 102, 107 (S.D.1987) (Henderson, J., specially concurring). In said special concurrence, *id.* at 107, the special writer cited *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948). It was from this case that our announced and reannounced rule from *In re Estate of Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970), was birthed. In *United States Gypsum Co.,* it was enunciated: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.,* 333 U.S. at 395, 68 S.Ct. at 542, 92 L.Ed. at 766 (emphasis added). I am convinced that although there is *some evidence* to support the findings of the Department of Health, this Court, the reviewing Court, should hold that on the entire evidence, a conviction is definite and firm that a mistake has been committed by the lower court. In said special concurrence, 411 N.W.2d at 107, I quoted from *Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66, 79 (1982), wherein our Highest Court in the land emphasized that the clearly erroneous standard "does not apply to conclusions of law." In 1982, the United States Supreme Court, in *Inwood Labs. v. Ives Labs.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606, 616 n. 15 (1982), held that "if the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." We must, as I said in this special concurrence, 411 N.W.2d at 107, bifurcate with certainty, our scope of review on findings of fact and conclusions of law. In *Bennett v. Jansma,* 329 N.W.2d 134, 136 (S.D.1983), Justice Morgan, writ-

ing for a unanimous Court, wrote, *inter alia,* "[w]e review the conclusions of law to determine whether they are in error as a matter of law." Therefore, two of the three basis of this appeal are grounded upon contentions of errors of law.

### FINDING OF NO BED NEED WAS CLEARLY ERRONEOUS

It is apparent that the Department of Health decided that there was no bed need by using "formulas"; these "formulas" were both complex and unwieldy. In determining that there was no bed need, basic facts were cast aside and rigidity was used via "formulas." Forgotten was the human element, namely that elderly people were seeking placement in Yankton and were being placed outside of Yankton County, long distances away from their friends and families. State Department of Health conceded that Yankton Care Center had good plans and good finances. Yankton Care Center was a good facility with a fine quality of service. This is substantiated by the record. Preceding the year in which the application was filed, there were 42 people on Yankton's waiting list. Does this suggest that there was no "need"? Extensive evidence was submitted by appellant reflecting individuals who sorely needed placement in this particular facility. Yet, this state agency shut the door on them. In fact, in the City of Yankton, it was established by evidence that there existed a 98% occupancy rate and there were only a few vacancies which were accounted for by death or moves or replacements. Appellant submitted studies reflecting that the elderly population was increasing throughout the nation and that it was dramatically increasing in the Yankton, South Dakota area, all of which would suggest that there would be an additional need for beds in the future. Furthermore, evidence was submitted to establish that hospitals were discharging patients at an earlier time than in past years because of costs and hospital needs and that this was likewise impacting the increasing elderly population's need for beds in a facility such as the appellant. Projections by the University of South Dakota professor were admitted into evidence proving that there was an increasing elderly population in the City of Yankton and in the area immediately surrounding it. Actually, the professor's projections were, using four different theories, that shortages would exist of either 45 beds, or 35 beds, or 55 beds. By the year 1990, an additional projection was testified to that there would be a shortage of 59 beds. To avert any denial of its application, appellant presented evidence establishing that alternative services, *i.e.,* home health, were well developed in the City of Yankton and Yankton County and were being extensively utilized.

It appears that the Department rejected all updated population projections and used its own "bed need formula" to determine that there was actually a surplus of beds in the City of Yankton. Apparently, the Department opined that there were available beds across the county line which would meet any shortage of beds in the Yankton County area. This appears to be a rather callous viewpoint towards the sentiments and humane considerations of elderly people in desiring to spend the twilight of their life in their home community. Again and again, the Department of Health, using its formulas, seemed to say that there was a lack of bed need by "relevant formulas." I cannot believe that these formulas are "etched in stone." It appears to me that the Department refused to take into consideration *factual* evidence of need presented by appellant, not to mention all of the updated population projections. Put another way, the Department of Health used methodology upon which to base its decision and not reality. Surely, under the Administrative Rules of South Dakota, cited in the majority opinion, it is clear that an exception was established. I note that Clay County, adjacent to Yankton County, has facilities for the elderly and there was evidence establishing that these facilities were totally full. Also, there was evidence to show that the City of Yankton is not only a commercial hub in that area, but also a medical hub with excellent hospitals and training facilities for young nurses. Therefore, I am compelled to state that the Department's decision to deny this applica-

tion for 30 additional beds is clearly erroneous and should be reversed. *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970).

## ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION BY DEPARTMENT OF HEALTH

Department is not, unto its own self, true. Yankton County and the City of Yankton seem to be meaningless to the Department's decision. In fact, on page 33 of its brief, the Department reflects, the "Department's evidence indicated a need for additional beds in Yankton County is of no moment." As indicated, the Department uses, and is required to use, the service area population served by the facility's proposed project set forth in the MFP as the primary criteria for determining bed need. In my opinion, from reading this case, Yankton County and, particularly, the City of Yankton, is the applicable service area and the Department of Health superficially substitutes methodology for reality. In its June 12 decision, the Department clearly expressed that its decision to deny the application was based on a lack of bed need as indicated by the "relevant formulas." The trial court found that the Department of Health used its bed need formulas "exclusively" and expressed that it was "compelled" to write an addendum to the trial court's decision. This agency clearly refused to recognize an exception which was established by a state regulation. This is a mistake of law; it is an error of law; it is a misapprehension of law. *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Oft over, the Department, not only below, but in its brief, structures itself legally in this position: Bed need is determined by using *only* the bed need formulas. To project need, by a formula only, is unrealistic. Department maintains that its formula is absolutely accurate and reliable. You cannot apply formulas in total isolation. It does not make sense. *See Department of Health v. Lutheran Hosp. & Homes Soc.*, 227 Neb. 116, 125–29, 416 N.W.2d 222, 228–29 (1987). In *In re Application by St. Luke's Hosp.*, 414 N.W.2d 297 (S.D.1987),

this Court recognized that, spiritually, the state health plan was not a plan which provided total, absolute, mandatory rules and regulations to either be complied with or violated. Rather, our state health plan, so said this Court, was to establish broad policies and general goals. Surely, a goal cannot be to prevent elderly people from having a bed when they need it because of some strict interpretation of a formula.

## DEPARTMENT'S DECISION WAS MADE UPON UNLAWFUL PROCEDURE AND AFFECTED BY OTHER ERROR OF LAW

A reconsideration of Certificate of Need applications is set forth in ARSD 44:01:14:01. Essentially, a party may request a reconsideration upon a decision based upon new, relevant information which the Department had not considered before *or* significant changes in the factors or circumstances relied upon by the Department when it reached its original decision.

This health care facility submitted three items of new evidence which had not been previously considered. This consisted of population projections for the area and an in-and-out migration data with information pertaining to the existence of alternative services. The Department, summarily, expressed that it refused to consider this new evidence. Instead of opening its mind and then opening the door of reconsideration with relevant evidence, the Department of Health chose to be unyielding with its grip on the single formula and methodology it employed. If this health facility's evidence had been reconsidered, an open mind would see that there was an extensive need for beds existing in the City of Yankton and in Yankton County. In fact, one of the *new* projections, based upon 1990 population figures, established that the shortage of beds would be as high as 81. There are in-migration residents from the State of Nebraska which further impact Yankton, a historical city near the great Missouri River which separates Nebraska and South Dakota. Data, statistics, projections, and evidence were not even considered upon an

application for reconsideration because the agency had "made up its mind."

As I have said in the past, when government bureaus and agencies go awry, which are adjuncts of the legislative or executive branches, the people flee to the third branch, their courts, for solace and justice. I cannot, in good conscience, join the majority opinion which prevents elderly citizens from having a bed, with medical care and treatment, administered compassionately, in a community where their children and grandchildren reside. I would elevate reality over a single methodology and accordingly dissent.

"[T]herefore never send to know for whom the bell tolls; it tolls for thee." John Donne (1573–1631), Devotions upon Emergent Occasions, Meditation XVII. My mind drifts to Ernest Hemingway. And a clod of dirt. Chipped away from the shores of Europe by the sea. "If a clod be washed away by the sea, Europe is the less...." *Supra.* All from whence, Hemingway's great novel was born. And, yes, not a person is turned away from a bed of repose, in his older years, but South Dakota is lesser—in spirit. A refrain also comes to my mind: "And crown thy good, with Brotherhood, from sea to shining sea."